# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

November 4, 2026

Thomas B. Plunkett, III
Clerk

No. 24-20255

Casa Tradición S.A. de C.V.,

*Plaintiff—Appellant*,

*versus*

Casa Azul Spirits, L.L.C.,

*Defendant—Appellee*.

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:22-CV-2972

Before Elrod, *Chief Judge*, Engelhardt, *Circuit Judge*, and Guidry, *District Judge*.*

Jennifer Walker Elrod, *Chief Judge*:

"Mi casa es su casa" is a warm Spanish expression of welcome that translates to "My house is your house." "Mi Clase Azul no es su Casa Azul" more accurately describes this lawsuit.

This case is a trademark dispute between two companies that sell tequila products. Plaintiff Casa Tradición sells tequila under its Clase

* United States District Judge for the Eastern District of Louisiana, sitting by designation.

AZUL mark and alleges that the defendant's sale of tequila products under the defendant's CASA AZUL mark is likely to confuse consumers.[1]

Clase Azul sued Casa Azul for trademark infringement under the Lanham Act and Texas law. Following a bench trial, the district court entered judgment for Casa Azul, finding that Clase Azul failed to establish a likelihood of consumer confusion. Clase Azul appeals, arguing that the district court erred in its likelihood of confusion analysis, among other things. Because we agree that some of the district court's factual findings were clearly erroneous, we VACATE the district court's judgment and REMAND for proceedings consistent with this opinion.

# I

Arturo Lomelí developed Clase Azul tequila around 1999. In 2003, Lomelí and his business partner, Juan Sanchez, began selling Clase Azul in the United States. Over time, they grew the brand into a luxury spirit that is currently sold in over 85 countries. The Clase Azul product line now includes seven varieties of tequilas and mezcals. In 2008, Clase Azul registered its CLASE AZUL mark with the United States Patent and Trademark Office for use in connection with tequila.

---

[1] For simplicity, we refer to the plaintiff, Casa Tradición, as the name of its tequila, "Clase Azul." Plaintiff refers to all of its entities collectively as "Clase Azul Group" or "Clase Azul Spirits."

Clase Azul emphasizes Mexican culture, heritage, and artisanship by packaging its Clase Azul tequila in hand-painted ceramic decanters.



Clase Azul describes its consumer as the "conscious connoisseur" and targets older, affluent consumers. Clase Azul tequila sells from $130 per bottle to upwards of $30,000 for a bottle of limited-release tequila. Between the hand-painted decanter and the price point, Clase Azul markets itself as a drink of "prestige and royalty."

In April 2006, two years before Clase Azul registered its mark, American entrepreneur Lance Collins filed a U.S. trademark application for Casa Azul in connection with wine.[2] Receiving no opposition to the trademark, the USPTO registered the mark in May 2008. For years, Collins sold wine under the Casa Azul mark. In 2018, Collins applied to register Casa Azul for "alcoholic beverages" generally, excluding "beer" (which covers all spirits including tequila). Absent objection from the public, the USPTO registered the mark in 2019.

[2] The application initially sought a trademark for "Casa Azule" but was amended to "Casa Azul" in May 2006.

In 2021, Collins founded Casa Azul Spirits, LLC, to continue the development of two products using the CASA AZUL mark, which Collins assigned to the LLC: a ready-to-drink canned tequila soda cocktail and a bottled organic tequila spirit. In June 2022, Casa Azul launched its Casa Azul canned tequila soda cocktails.

Casa Azul Spirits began selling its tequila soda in retail stores alongside other canned alcoholic beverage brands like High Noon, Truly, and White Claw. The sodas come in a variety of flavors like lime, strawberry margarita, peach mango, and watermelon, and are sold in bright teal cans, with the name Casa Azul prominently displayed.




Casa Azul's tequila soda line targets young consumers who seek affordable drinks, and the tequila sodas sell for a few dollars each. The company engages consumers through sponsored events at food and wine and music festivals, social media, and web marketing.

Three months after Casa Azul Spirits launched its tequila soda line under the CASA AZUL mark, Clase Azul filed a lawsuit for trademark infringement and unfair competition under the Lanham Act, 15 U.S.C. § 1051 *et seq.*, and Texas law, seeking injunctive relief, monetary damages, attorney's fees, and cancellation of Casa Azul's trademark registration. Clase Azul moved for a preliminary injunction, which the district court denied.

In 2023, during the pendency of this lawsuit, Casa Azul launched an organic, additive-free bottled tequila. The Casa Azul tequila ranges from $69.99 to $129.99 per bottle and comes packaged in aqua-colored frosted or tinted glass bottles.




After the launch of Casa Azul distilled tequila, Clase Azul amended its complaint to challenge the use of the CASA AZUL mark for bottled tequila.

Before trial, the district court denied two requests from Clase Azul: (1) the addition of forty-six trial witnesses one month before the close of discovery, and (2) a ninety-day extension of the discovery schedule to conduct additional post-launch surveys of Casa Azul's bottled tequila. The district court permitted discovery on two of Clase Azul's forty-six additional witnesses but otherwise did not permit additional discovery on Casa Azul's bottled tequila.

Following a five-day bench trial and post-trial briefing, the district court issued its findings of fact and conclusions of law. The court determined that Casa Azul was not liable for trademark infringement because most "digits of confusion" weighed against a finding of confusion. Without a likelihood of confusion, the court found no basis to cancel Casa Azul's registration or issue an injunction, and Clase Azul's unfair competition and state law dilution claims likewise failed. Clase Azul timely appealed,

challenging the district court's confusion analysis and its limitation of certain trial evidence.

## II

"The standard of review for a bench trial is well established: findings of fact are reviewed for clear error and legal issues are reviewed de novo." *Guzman v. Hacienda Recs. & Recording Studio, Inc.*, 808 F.3d 1031, 1036 (5th Cir. 2015) (citation omitted). "Likelihood of confusion is a question of fact" reviewed for clear error. *Viacom Int'l v. IJR Cap. Invs., L.L.C.*, 891 F.3d 178, 192 (5th Cir. 2018). Under the "clear error" standard, this court may not set aside the district court's factual findings unless it is "left with the definite and firm conviction that a mistake has been committed." *Appliance Liquidation Outlet, L.L.C. v. Axis Supply Corp.*, 105 F.4th 362, 374 (5th Cir. 2024). "This standard plainly does not entitle this court to reverse the findings of the trial judge simply because we are convinced that we would or could decide the case differently." *Guzman*, 808 F.3d at 1036 (citation omitted). When "there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Id.*

Clase Azul asserts that likelihood of confusion "is often reviewed *de novo*." Clase Azul cites *Elvis Presley Enterprises, Inc. v. Capece*, where we stated that "we may conduct a de novo review of the fully-developed record before us" when "a likelihood-of-confusion factual finding is 'inextricably bound up' in, or infected by, a district court's erroneous view of the law." 141 F.3d 188, 196 (5th Cir. 1998) (quoting *Anheuser-Busch, Inc. v. Balducci Pubs.*, 28 F.3d 769, 773 (8th Cir. 1994)). A factual finding is "infected" by legal error when the erroneous legal premise supplied the basis for, or "permeated" it. *Id.* at 198. But the record is only "fully-developed" such that *de novo* resolution of the infected factual finding is appropriate only when correcting the legal error leaves no need for further factfinding or weighing

of competing permissible inferences. *See Pullman-Standard v. Swint*, 456 U.S. 273, 292 (1982) ("[W]here findings are infirm because of an erroneous view of the law, a remand is the proper course unless the record permits only one resolution of the factual issue[.]").

In this opinion, we find two legal errors. *First*, the district court erred by considering third-party use of the relevant terms in the accused product's mark rather than the senior user's mark. But, as we explain, correcting that error does not leave a factual question that we can resolve on the existing findings, either for the third-party-use subfactor or for the strength-of-the-mark digit. *Second*, the district court erred by applying the wrong legal standard in assessing the similarity of the parties' products. When the correct legal standard is applied, "the record permits only one resolution of the factual issue," *Pullman-Standard*, 456 U.S. at 292, so we may reach that conclusion without impermissibly substituting our own factfinding for the district court's.

## III

Clase Azul argues that the district court erred in applying the likelihood of confusion factors. "To prevail on a claim of federal trademark infringement under the Lanham Act, a plaintiff must show (1) ownership of a legally protectable mark and (2) a likelihood of confusion created by an infringing mark." *All. for Good Gov't v. Coal. for Better Gov't*, 901 F.3d 498, 505 (5th Cir. 2018). To determine whether there is a likelihood of confusion, the court considers "eight nonexhaustive 'digits.'" *Id.* at 508. These include:

> (1) the type of mark allegedly infringed, (2) the similarity between the two marks, (3) the similarity of the products or services, (4) the identity of the retail outlets and purchasers, (5) the identity of the advertising media used, (6) the

> defendant's intent, (7) any evidence of actual confusion, and (8) the degree of care exercised by potential purchasers.

*Appliance Liquidation Outlet*, 105 F.4th at 381. While no one factor is dispositive, and while a likelihood of confusion need not be supported by a majority of factors, some factors—such as actual confusion—carry heavier weight than others. *All. for Good Gov't*, 901 F.3d at 509. The weight of each digit may vary from case to case. *Future Proof Brands, L.L.C. v. Molson Coors Beverage Co.*, 982 F.3d 280, 298 (5th Cir. 2020). We address each of the disputed digits in turn.[3]

A

We begin with the "strength of the mark" digit. Clase Azul contends that the district court erred in its conclusion that the CLASE AZUL mark is "not strong," weighing against a likelihood of confusion. We agree with Clase Azul that some of the district court's factual findings on this digit are clearly erroneous and that the district court legally erred in its analysis of third-party use.

We consider two factors when assessing the strength of a mark: (1) "where the mark falls on a spectrum" of distinctiveness, and (2) the mark's standing in the marketplace. *All. for Good Gov't*, 901 F.3d at 509.

1

We begin with where the CLASE AZUL mark falls on the distinctiveness spectrum, which—ranging from weakest to strongest—spans the following categories: (1) generic; (2) descriptive; (3) suggestive; (4) arbitrary; or (5) fanciful. *Appliance Liquidation Outlet*, 105 F.4th at 375.

---

[3] Clase Azul did not challenge the district court's decision on the sixth digit, defendant's intent, so we do not address that digit in our analysis.

Judge Henry Friendly established these categories in *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4 (2d Cir. 1976).

A generic term refers to "the genus of which the particular product is a species." *Id.* at 9. Generic marks are wholly ineligible for trademark registration and protection. *U.S. Pat. & Trademark Off. v. Booking.com B. V.*, 591 U.S. 549, 551 (2020). For example, no one could trademark the word "wine," at least when using that word to refer to the drink, because the term is incapable of distinguishing one source of the drink from another. *Id.* at 554.[4] The parties agree that CLASE AZUL is not a generic mark.

At the other end of the spectrum, CLASE AZUL is neither fanciful nor arbitrary. A "fanciful" mark is one that is invented solely for use as a trademark. *Abercrombie*, 537 F.2d at 11 n.12. The KODAK mark for film is a classic example. *See Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 210 (2000). An "arbitrary" mark typically refers to words that exist but are "applied in an unfamiliar way." *Abercrombie*, 537 F.2d at 11 n.12. The CAMEL mark for cigarettes is a classic example. *See Wal-Mart*, 529 U.S. at 210 (2000).

"Arbitrary marks *bear no relationship* to the products or services to which they are applied." *Trojan Battery Co. v. Golf Carts of Cypress, L.L.C.*, 175 F.4th 582, 592–93 (5th Cir. 2026) (quoting *Future Proof*, 982 F.3d at 291).

---

[4] In the United States, TEQUILA is a registered *certification mark* that is owned by Consejo Regulador del Tequila, A.C. (CRT). *See* TEQUILA, Registration No. 5,225,126. A certification mark is distinct from a trademark in that it is intended "to be used by those *other than its owner*, to indicate the quality, accuracy, or other characteristics of the goods or services." *Int'l Info. Sys. Sec. Certification Consortium, Inc. v. Sec. Univ., LLC*, 823 F.3d 153, 159 (2d Cir. 2016) (citing 15 U.S.C. § 1127). Using this mark, CRT certifies that when a product calls itself "tequila," that product is, among other things, manufactured in Mexico from a specific variety of the blue agave plant grown in certain regions of Mexico. *Luxco, Inc. v. Consejo Regulador del Tequila, A.C.*, 121 U.S.P.Q. 2d 1477, 1479 (T.T.A.B. 2017).

For example, we held that the mark BRIZZY was not an arbitrary mark for a hard seltzer because it rhymed with "fizzy," denoting the "carbonated quality of hard seltzers." *Future Proof*, 982 F.3d at 292. Similarly here, "azul" in CLASE AZUL bears relation to the product because Clase Azul's tequila is made from the blue weber agave plant. There are many other tequila brands with "azul" in their names for that reason, such as Azulejos, Aroma Azul, Campo Azul, Flecha Azul, Arte Azul, Lunazul, Piedra Azul, and Cazul 100. The district court also found that "blue class," the English translation of "clase azul," connoted a "higher class of tequila." The CLASE AZUL mark is therefore not arbitrary.

That means that CLASE AZUL is either descriptive or suggestive. A descriptive mark "'identifies a characteristic or quality of an article or service,' such as its color, odor, function, dimensions, or ingredients." *Zatarains, Inc. v. Oak Grove Smokehouse, Inc.*, 698 F.2d 786, 790 (5th Cir. 1983) (quoting *Vision Ctr. v. Opticks, Inc.*, 596 F.2d 111, 115 (5th Cir. 1979)), *abrogated on other grounds by KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 543 U.S. 111 (2004). Examples of descriptive terms include ALO for products containing gel from the aloe vera plant, *Aloe Crème Labs., Inc. v. Milsan, Inc.*, 423 F.2d 845, 848 (5th Cir. 1970), VISION CENTER for a business that "deals in optical goods," *Vision Ctr.*, 596 F.2d at 117, FISH-FRI for a product that is used to fry fish, *Zatarains*, 698 F.2d at 793, MACHINERY MOVERS for a machinery-moving company, *Am. Mach. Movers v. Mach. Movers of New Orleans, LLC*, 2002 WL 494474, at *1 (5th Cir. Mar. 14, 2002), and READ A MILLION WORDS for a reading program to encourage students to read books, *Springboards to Educ., Inc. v. Hous. Indep. Sch. Dist.*, 912 F.3d 805, 814 (5th Cir. 2019).

A suggestive term, by contrast, "suggests, rather than describes, some particular characteristic of the goods or services to which it applies." *Zatarains*, 698 F.2d at 791. It requires a consumer to use some imagination

or thought to connect the term to the nature of the goods. *Id.* For example, although READ A MILLION WORDS was a descriptive mark, we held in the same case that MILLIONAIRE READER, MILLION DOLLAR READER, and MILLIONAIRE'S READING CLUB were suggestive—it takes a mental leap to equate a millionaire with a child who has read a million words. *Springboards*, 912 F.3d at 815. We likewise held that TEXAS FLY SWATTER was suggestive of an oversized fly swatter because, as we oft remark in this circuit, "everything is larger in Texas." *Artcraft Novelties Corp. v. Baxter Lane Co.*, 685 F.2d 988, 991 (5th Cir. 1982).

Most on point here are two cases regarding consumable products. We held that the mark BRIZZY for a hard seltzer was suggestive rather than descriptive because to conclude anything about the product, the consumer had to make an inference. *Future Proof*, 982 F.3d at 291.[5] It would require an inference for a consumer to surmise that BRIZZY—because it rhymed with "fizzy"—connoted carbonation. *Id.* The consumer would first have to "infer that 'brizzy' is a play on 'fizzy.'" *Id.*[6]

We likewise held that METCHUP, a mark for, "depending on the batch," a "blend of either Walmart-brand mayonnaise and ketchup" or "Walmart-brand mustard and ketchup," was suggestive. *Perry v. H. J. Heinz Co. Brands, L.L.C.*, 994 F.3d 466, 468, 472 (5th Cir. 2021). While it required "a little imagination" to draw a conclusion about the nature of the product, the "mash-up of a name relates to the names of the two sauces that form the blend." *Id.*

---

[5] To be precise, we held that it was clearly erroneous for the district court to find that the BRIZZY mark was "descriptive" rather than "suggestive." *Future Proof*, 982 F.3d at 292.

[6] We also held that an inference would be required for a consumer to conclude that BRIZZY connoted alcohol content because it rhymed with "dizzy." *Future Proof*, 982 F.3d at 291.

By that same logic, Clase Azul is a suggestive mark. Even though, as the district court concluded, "azul" may signal that the tequila contains "blue agave," the full mark, "Clase Azul," is understood fully only through the "exercise of the imagination." *Future Proof*, 982 F.3d at 292. Just as the consumer first must conclude that Brizzy is a play on "fizzy," the consumer here must first conclude that "azul" is a reference to the blue weber agave plant rather than a blue raspberry flavored soft drink, a blue sports drink, or a cocktail containing blue curaçao. The Kelley Blue Book is not a catalog of tequila.

*Perry* is even more on point. There, the Metchup mark was a "mash-up" of the ingredients of the product. The Clase Azul mark contains only a portion of the name of the "blue weber agave plant" ingredient, requiring the consumer to make an even greater inference.

The district court also found that Clase Azul was descriptive because it conveyed a "higher class of tequila." This interpretation further indicates that Clase Azul is a suggestive mark. The Fourth Circuit determined that Pizzeria Uno, which is Italian for "number one pizza restaurant," was a suggestive mark. *Pizzeria Uno Corp. v. Temple*, 747 F.2d 1522, 1533 (4th Cir. 1984). The Eleventh Circuit affirmed a finding that the mark Super Blue Crystal Clear is suggestive for a dark blue colored swimming pool water clarifier. *Robarb Inc. v. Pool Builders Supply of Carolinas Inc.*, 21 U.S.P.Q.2d 1743, 1752, 1991 WL 335811 (N.D. Ga. 1991), *aff'd*, 996 F.2d 1231 (11th Cir. 1993) and *aff'd*, 996 F.2d 1232 (11th Cir. 1993). Another court has held that Coronas which is Spanish for "crowns," was a suggestive mark for a wine brand. *Miguel Torres S.A. v. Cantine Mezzacorona S.C.A.R.L.*, 52 U.S.P.Q.2d 1557, 1999 WL 1040107 (E.D. Va. 1999), *vacated and remanded on other grounds*, 108 F. App'x 816 (4th Cir. 2004).

We have articulated four tests to gauge whether a term is descriptive or suggestive, and each points to Clase Azul being suggestive. *First*, the

"dictionary test." Because a dictionary definition is good evidence of a word's meaning to the ordinary public, if the definition describes the product, the mark is likely descriptive. *Zatarains*, 698 F.2d at 792. Because the definition of the term "fish fry" included "fried fish," the FISH-FRI mark was descriptive of a product used to fry fish because it "naturally direct[ed] attention to the purpose or function of the product." *Id.* "Blue class" is not a term in a dictionary, so this test is "inapplicable." *Future Proof*, 982 F.3d at 292 n.11; *see also Blendco, Inc. v. Conagra Foods, Inc.*, 132 F. App'x 520, 521–22 (5th Cir. 2005).

*Second*, the "imagination test." This test measures the gap between the words and the goods. *See Zatarains*, 698 F.2d at 792. As noted, a consumer must make an inference to connect CLASE AZUL to the blue weber agave plant (and then to tequila). We cannot say that "a consumer unfamiliar with the product" would "have an idea of its purpose or function." *Id.*

*Third*, the competitors'-need test. We ask "whether competitors would be likely to need the terms used in the trademark in describing their products." *Id.* at 793 (quoting *Union Carbide Corp. v. Ever-Ready, Inc.*, 531 F.2d 366, 379 (7th Cir. 1976)). No party suggests that tequila brands need to use the term "blue class" to describe their products, and we are unaware of such use.

*Fourth*, the competitors'-use test. We examine "the extent to which a term actually has been used by others marketing a similar service or product." *Id.* at 793. The record contains no evidence of any other tequila brand using the phrase "clase azul" or "blue class" to refer to or market its product.

Because each of the four tests leads to the same answer, the record does not support the district court's classification of the mark as descriptive.

Accordingly, the district court's finding that Clase Azul is descriptive rather than suggestive is clearly erroneous.[7]

2

We turn now to the second sub-factor to gauge Clase Azul's strength: the mark's standing in the marketplace. *All. for Good Gov't*, 901 F.3d at 509. Clase Azul asserts that the district court erred when it found that its mark lacked marketplace recognition as a brand—despite contrary evidence—and was weak due to third-party use of similar marks. We agree with Clase Azul that the district court clearly erred.

The district court found that the Clase Azul word mark lacked marketplace recognition even though its distinctive blue-and-white bottles had widespread market recognition. Marketplace standing is demonstrated by duration of use, advertising efforts, sales numbers, and consumer recognition of the mark. *See Sun-Fun Prods., Inc. v. Suntan Rsch. & Dev. Inc.*, 656 F.2d 186, 190–91 (considering seven years of use and promotional efforts); *All. for Good Gov't*, 901 F.3d at 510 (5th Cir. 2018) (considering duration of use and variety of media used to promote mark); *see also Bose Corp. v. QSC Audio Prods. Inc.*, 293 F.3d 1367, 1371–74 (Fed. Cir. 2002) (strength of a mark is often "measured indirectly . . . by the volume of sales and advertising expenditures . . . and by the length of time those indicia of commercial awareness have been evident").

Clase Azul has sold tequila under the name "Clase Azul" since at least as early as 2003. The Clase Azul mark has been registered in the United

---

[7] The district court did not apply any of the four tests that this court uses to distinguish descriptive from suggestive marks. That omission does not, however, require us to decide whether this was a legal error that may trigger *Capece*'s *de novo* review. Under even the more deferential clear-error standard, the record does not support the district court's classification of the mark as descriptive.

States since 2008. Clase Azul products are sold in approximately 54,000 total accounts across the United States. Clase Azul's total sales in the years 2021, 2022, and 2023 were $205 million, $280 million, and $250 million, respectively. Around 80% of these sales were in the United States. *See Trojan Battery*, 175 F.4th at 593 (upholding finding of commercial strength based on "hundreds of millions in sales").

CLASE AZUL has widespread exposure to and recognition by consumers. In 2022, CLASE AZUL received media coverage in the publications Architectural Digest, artnet, The Hollywood Reporter, GQ, Esquire, Vogue, Forbes, elitetraveler, Nobleman, Agave Gold, Observer, delish, departures, Town & Country, Nasdaq, Travel + Leisure, Observer, W, Grazia, New York Post, Wall Street Journal, Penta, and—the aptly named—Tequila. Each of these features included the word mark CLASE AZUL.

CLASE AZUL is also mentioned and featured in songs by popular recording artists Kanye West,[8] J. Cole,[9] Tee Grizzley,[10] and Peso Pluma.[11] The popular recording artist Ozuna released a song entitled "Clase Azul," which also mentions CLASE AZUL in its lyrics.

---

[8] The Game & Kanye West, *Eazy*, *on* DRILLMATIC Heart vs. Mind (100 Entertainment, Numinati Records & Virgin Records Aug. 12, 2022) ("Banana clips in the pool, swan dive in Clase Azul"); *see also* Kanye West & Peso Pluma, *LAST BREATH*, *on* LAST BREATH [single] (Kanye West & Sheffmade June 27, 2025) ("Way too much tequila, Clase Azul").

[9] Bas & J. Cole, *Passport Bros*, *on* We Only Talk About Real S—When We're F— Up (Dreamville/Interscope Dec. 15, 2023) ("Clase Azul got me singin,' 'I love you too'").

[10] Tee Grizzley, Chris Brown & Mariah the Scientist, *IDGAF*, *on* IDGAF [single] (Chopsquad DJ Sept. 8, 2023) ("Two shots of that Clase Azul, I'm ready to fool").

[11] Peso Pluma, *Por Las Noches*, *on* Por Las Noches [single] (El Cartel de Los Ángeles June 11, 2021) (Spanish lyrics that translate to "Clase Azul is the tequila and underwear are the clothes").

The district court's finding that CLASE AZUL does not enjoy strong marketplace recognition is clearly erroneous.[12]

3

We turn now to the district court's finding that extensive use of the words "Casa" and "Azul" across tequila brands diminished CLASE AZUL's strength. "Evidence of third party use of similar marks on similar goods is admissible and relevant to show that a mark is relatively weak and entitled to only a narrow scope of protection." 2 McCarthy on Trademarks and Unfair Competition § 11:88 (5th ed. 2024) ("McCarthy") (internal citations omitted). The reason that third-party use bears on strength follows from what a trademark does. A mark is protected because—and to the extent that—it identifies a single source in the minds of consumers. *See Jack Daniel's Props., Inc. v. VIP Prods. LLC*, 599 U.S. 140, 146 (2023).

When many marks use the same term, consumers stop using the shared term to distinguish the product among others, and the mark's strength accordingly weakens for two reasons. *First*, consumers turn to other source identifiers—like a logo, a color scheme, or trade dress—to distinguish the product. *Second*, consumers become trained to home in on the non-shared features of the word mark to distinguish between products. When a trademark exists among many "similar marks on similar goods or services, slight differences in names may be meaningful because consumers will not likely be confused between any two of the crowd and may have learned to carefully pick out one from the other." *See Fla. Int'l Univ. Bd. of*

[12] Clase Azul does not argue that the district court committed a legal error in analyzing the marketplace-recognition sub-factor. But even if it did, we would reach the same result on this sub-factor under *de novo* review that we do on the more deferential clear-error review.

*Trs. v. Fla. Nat'l Univ., Inc.*, 830 F.3d 1242, 1260 (11th Cir. 2016) (quotation marks omitted).

This phenomenon is known in trademark lingo as a "crowded field." As an example, the beauty pageant industry is a "crowded field" in that many pageants "use a mark which is composed of a marital prefix and a defining geographic term." *Miss World (UK) Ltd. v. Mrs. Am. Pageants, Inc.*, 856 F.2d 1445, 1449 (9th Cir. 1988), *abrogated in part on other grounds by Eclipse Assocs. Ltd. v. Data Gen. Corp.*, 894 F.2d 1114, 1116 n.1 (9th Cir. 1990). So too are institutions of higher learning in Florida. *See Fla. Int'l Univ.*, 830 F.3d at 1258 (concluding that the plaintiff, Florida International University, "operates in a crowded field of three-word university names that involve the words 'Florida' and 'University,' and that these names, therefore, are not particularly distinct to consumers").

A mark surrounded by such third-party use therefore signals less and is less likely to be confused with a newcomer's use of the same term. The touchstone is "whether the third-party use diminishes in the public's mind the association of the mark with the plaintiff." *Bd. of Supervisors for La. State Univ. Agric. & Mech. Coll. v. Smack Apparel Co.*, 550 F.3d 465, 479 (5th Cir. 2008). Where it does, "'extensive' third-party use can weaken a mark and negate a likelihood of confusion." *Id.* (quoting *Sun Banks of Fla., Inc. v. Sun Fed. Sav. & Loan Ass'n*, 651 F.2d 311, 316 (5th Cir. 1981)).

Here, the district court found that "[t]he terms 'casa' and 'azul' have been used extensively in the tequila market" and that the "extensive third-party use of the disputed terms diminish[es] the strength of the CLASE AZUL mark." The district court committed an error of law in looking at third-party use of the terms "*casa*" and "azul" rather than "*clase*" and "azul." On this digit of confusion, the "focus is on" the senior user's mark. *Viacom*, 891 F.3d at 193 (citing *Elvis*, 141 F.3d at 201). Third-party use

diminishes a mark only insofar as it concerns that mark or an element that the mark actually contains. Use of a term that the senior mark does not contain cannot, by itself, erode the public's association of CLASE AZUL with its owner. *See La. State Univ.*, 550 F.3d at 479 (the question is whether third-party use "diminishes in the public's mind the association of the mark with the plaintiff").

Clase Azul takes it a step further and argues that the district court should only have looked to third-party uses that employ a combination of "clase" and "azul" or a similar combination. That argument is contrary to our precedent. "We do not require third-party usage involving the plaintiff's *entire* mark, but instead only the *portion* of the plaintiff's mark that the defendant also uses." *Future Proof*, 982 F.3d at 293. Thus, in *Future Proof*, because the products "Brizzy" and "Vizzy" shared the "izzy" root, we looked to third parties that also branded their products with the "izzy" root, like FIZZY sparkling water and BIZZY coffee. *See id.* at 293–94.

Casa Azul pointed to third-party use that shared more than just "azul." For example, Casa Azul introduced evidence of registration of the marks CAMPO AZUL, CASAZUL TEQUILA, CASINO AZUL, and CAZUL 100. Because these marks likewise begin with "c," the evidence is stronger that consumers tune in even closer to the differences: "ampo," "asa," "asino," and, as in plaintiff's mark, "lase." *See Omaha Steaks Int'l, Inc. v. Greater Omaha Packing Co., Inc.*, 908 F.3d 1315, 1324 (Fed. Cir. 2018) ("The purpose of introducing evidence of third-party use is 'to show that customers have become so conditioned by a plethora of such similar marks that customers "have been educated to distinguish between different [such] marks on the bases of minute distinctions."'" (quoting *Palm Bay Imps., Inc. v. Veuve Clicquot Ponsardin Maison Fondee en 1772*, 396 F.3d 1369, 1374 (Fed. Cir. 2005)).

Clase Azul also argues that the district court could not find that third-party use weakened the CLASE AZUL mark because Casa Azul did not introduce sufficient evidence to show the extent of the third-party use in the market. In *Streamline Production Systems, Inc. v. Streamline Manufacturing, Inc.*, the defendant argued that the use of the word "Streamline" in a third party's design mark weakened the strength of the plaintiff's mark. 851 F.3d 440, 454 (5th Cir. 2017). We rejected the defendant's argument because "no evidence was introduced at trial on the nature and extent of" the third party's "use of its design mark." *Id.*

But here, there was at least *some* evidence of third-party use as to *some* of the tequila brands. Casa Azul purchased several bottles of tequila in Houston in the days before the trial and introduced them as exhibits. There was evidence of third-party use as to those tequilas, which included Campo Azul, Casazul, Casino Azul, and Cazul 100. The record contains additional evidence that brands containing "azul" were well-promoted and recognized by consumers. For example, Casa Azul's brand manager, Connor Dowd, testified that at consumer events like music and food festivals, consumers asked, "Is this Mark Wahlberg's brand, Flecha Azul?"

To be sure, the district court should consider the absence of sales data, consumer surveys, and other evidence that would bolster a finding that the third-party uses are widespread and recognized by consumers. But the absence of that evidence goes to weight, not relevance. That absence should be balanced against whatever inference may be drawn from the fact that Casa Azul purchased the third-party tequila brands in Houston, among other record evidence.

In sum, the district court committed legal error by looking to third-party uses of the wrong terms. But that error does not trigger *Capece*'s *de novo* review here. Although the legal error infected the district court's

factual finding that third-party use diminished the strength of the CLASE AZUL mark, correcting the legal error requires additional factual findings concerning the extent and significance of third-party use of the relevant terms—findings that bear both on the third-party-use sub-factor and, ultimately, on the strength-of-the-mark digit. We cannot make those findings in the first instance because there may be multiple permissible resolutions when the correct legal standard is applied.

* * *

The district court clearly erred in finding that the CLASE AZUL mark was descriptive—it is suggestive. The district court also clearly erred in finding that the CLASE AZUL mark did not have a strong standing in the marketplace. Finally, the district court committed an error of law in looking at third-party use of the terms "*casa*" and "azul" rather than "*clase*" and "azul." That legal error cannot be neatly excised from the remainder of the likelihood-of-confusion analysis. The district court relied on its assessment of third-party use in evaluating the strength of Clase Azul's mark. And the district court's finding that "the CLASE AZUL mark is not strong" bore directly on its ultimate conclusion that there was no likelihood of confusion.

Accordingly, we must vacate and remand for the district court to reconsider its findings on third-party use, on the strength of CLASE AZUL's mark, and on a likelihood of confusion. On remand, the district court should weigh CLASE AZUL's classification as a suggestive mark and CLASE AZUL's strong standing in the marketplace against third-party use of the words "clase," "azul," or portions of those words.

B

We turn next to the "similarity of the marks" digit. "The more similar the marks, the greater the likelihood of confusion." *Streamline*, 851 F.3d at 454 (citing *Nautilus Grp., Inc. v. ICON Health & Fitness, Inc.*, 372 F.3d

1330, 1344 (Fed. Cir. 2004)). In assessing similarity, we compare "the marks' appearance, sound, and meaning." *Xtreme Lashes*, 576 F.3d at 228 (quoting *Elvis*, 141 F.3d at 201). "We compare the marks as a whole, not by isolating their constituent elements." *Sun Banks*, 651 F.2d at 317–18. The marks should be considered "in the context that a customer perceives them in the marketplace." *Future Proof*, 982 F.3d at 295.

The district court concluded that although CLASE AZUL and CASA AZUL are similar in sound, they are dissimilar in sight and meaning, and that this dissimilarity weighed against a likelihood of confusion. The district court acknowledged that the names may sound alike to English speakers, particularly when "Clase" is mispronounced as "kass-uh" or "klas-uh." But the district court determined that the visual differences—an additional letter in "Clase" that makes the ending significantly different than "Casa"—and the plainly different meanings of the terms' translations distinguished the marks. Even an English speaker with rudimentary Spanish knowledge knows that "casa" means "house," while "clase" corresponds to "class," as in a "category or type."

Clase Azul contends that the district court erred in its analysis of this digit in four respects: (1) the district court made no findings of fact concerning the commercial impression of either parties' mark; (2) the district court failed to consider the effect aural or phonetic similarity has on the meaning of the marks; (3) the district court's focus on an extra letter in "Clase" and a single different vowel in the middle of the marks constitutes an unrealistic focus not exhibited by the purchasers of the parties' products; and (4) the district court overemphasized the importance of translating the parties' marks.

We see no clear error in the district court's findings on this digit. The district court's findings on sight, meaning, and sound were supported by record evidence.

1

We begin with the visual similarity between the parties' marks. The marks CLASE AZUL and CASA AZUL differ in that "L" appears in CLASE (but not CASA) and CLASE ends with "E" while CASA ends with "A." Casa Azul's expert opined that these differences distinguished the marks in a way that is "perceivable, meaningful, and commonplace to speakers of English." Both native speakers of English as well as native speakers of Spanish, Casa Azul's expert opined, recognize the presence of an "L" as a visual difference that would affect a word's pronunciation and meaning. For example, English speakers readily recognize the difference between the words "can" and "clan," as well as between the words "cap" and "clap." English speakers also notice whether a word ends in "A" or "E"—that is the difference between the words "quota" and "quote." Clase Azul's expert, by contrast, did not analyze the marks' visual differences.

Clase Azul complains that the district court did not consider the "commercial impression" of the parties' marks. *See Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252, 261 (5th Cir. 1980) (requiring consideration of the "commercial impression created by the mark[s] as a whole"). But the district court properly considered how consumers encounter the parties' products. *See Future Proof*, 982 F.3d at 295 (quoting *Elvis*, 141 F.3d at 197) (court did not err in "focus[ing] on certain visual differences in product packaging").

The district court found that the trade dress of the products makes them visually dissimilar. Clase Azul's product is contained in decorated ceramic decanters while Casa Azul's tequila comes in frosted or tinted aqua-

colored bottles, and predominately features the CASA AZUL name. Casa Azul's cans are also distinctive because they are bright teal blue and prominently display the CASA AZUL name.










The district court also noted the distinct logos. Clase Azul's logo contains a circle, four tan leaves, and four dark blue "feathered" brushstrokes. Casa Azul's logo features a teal-colored stylized outline of a double-pitched roof house with a white agave plant superimposed on it. The words "CASA AZUL" appear in capital letters below the house.






The district court's findings on visual similarity were not clearly erroneous.

2

The district court also found that CLASE AZUL and CASA AZUL plainly mean different things, even to English speakers. Clase Azul argues that the district court over-emphasized the translation of the names into

English because consumers "are accustomed to tequila brands with Spanish names and are not likely consider the English translations of the parties' marks when encountering the marks in the marketplace." We disagree.

Casa Azul's expert opined that "casa" has a recognized meaning in American vernacular, evidenced by its inclusion in *Merriam-Webster* Dictionary. Casa Azul's expert also noted that "mi casa es su casa" is a Spanish phrase that is "so widely recognized that speakers of American English can even create and understand variations of the phrase." Familiarity with the word "casa" and lack of familiarity with the word "clase" in and of itself distinguishes the two marks in the eyes and ears of the consumer. The district court was free to credit Casa Azul's expert, especially given that Clase Azul's expert did not opine on the difference in meanings of the parties' trademarks, for either English or Spanish speakers.

3

On aural similarity, the district court noted that "the words can be carelessly spoken and carelessly heard." Clase Azul complains that the district court should have considered the effect that mispronunciation would have on the meaning of the words. Clase Azul argues that the aural similarity would be more pronounced in bars and restaurants. Indeed, 61% of the accounts that sell CLASE AZUL products are bars and restaurants.

But both parties' witnesses testified that most restaurants and bars have a drink menu where the patron can read the types of tequila. And the district court found that visual differences in the terms, bottles, and logos overcame occasional mispronunciation. Clase Azul argues that if a consumer, bartender, or waiter were to mispronounce either product, the consumer could be served the incorrect product. But Clase Azul did not introduce any evidence that this had ever occurred. Given the lack of evidence of mix-ups in bars and restaurants and the conflicting expert

testimony, we cannot say that the findings of the district court on this factor are clearly erroneous. *See United States v. Jackson*, 19 F.3d 1003, 1007 (5th Cir. 1994) ("[T]he questions of the credibility and weight of expert opinion testimony are for the trier of facts[.]").

The district court did not clearly err in finding that this digit weighed against a likelihood of confusion.

C

We turn next to the "similarity of the products" digit. "The greater the similarity between the products and services, the greater the likelihood of confusion." *Exxon Corp. v. Tex. Motor Exch. of Hous., Inc.*, 628 F.2d 500, 505 (5th Cir. 1980). When products are the same or substitutes for one another, the inference that consumers will think that the goods or services come from the same source is at its apex.

This digit's analysis is straightforward where the products are nearly identical. *See, e.g.*, *Xtreme Lashes*, 576 F.3d at 229 (digit favored likelihood of confusion where both parties sold eyelash extension kits in silver cases with various accoutrements). But the parties "need not be in competition" and the products "need not be identical" to find that the products are sufficiently similar under this digit. *Beef/Eater Restaurants, Inc. v. James Burrough, Ltd.*, 398 F.2d 637, 639 (5th Cir. 1968) (affirming a finding of likelihood of confusion between a restaurant and a company that hand makes and vends gin); *Gruma Corp. v. Mexican Restaurants, Inc.*, 497 F. App'x 392, 398–99 (5th Cir. 2012) (reversing judgment entered following bench trial and concluding that pre-packaged Mexican food and restaurant-sold Mexican food are sufficiently similar). Indeed, "widely divergent products have been held subject to confusion." *Fuji Photo Film Co. v. Shinohara Shoji Kabushiki Kaisha*, 754 F.2d 591, 597 (5th Cir. 1985) (collecting cases).

We have previously held that a restaurant is similar to a gin manufacturer because they both sell consumable products. *Beef/Eater Restaurants,* 398 F.2d at 639. Other courts have likewise concluded that different types of alcoholic products are similar. *See Fleischmann Distilling Corp. v. Maier Brewing Co.*, 314 F.2d 149, 159–60 (9th Cir. 1963) (concluding that beer and Scotch whiskey, "being both within the alcoholic beverage industry" are "so related"); *Maker's Mark Distillery, Inc. v. Diagea N. Am., Inc.*, 703 F. Supp. 2d 671, 691–92 (W.D. Ky. 2010) (finding that bourbon, whiskey, and tequila are related products and that "potential . . . consumers might believe a distilled spirits producer would sponsor or affiliate with a product in a different price range"); *Somerset Distilling Inc. v. Speymalt Whisky Distribs. Ltd.*, 14 U.S.P.Q.2d 1539, 1542 (T.T.A.B. 1989) (determining that "Scotch whisky, gin, and vodka are all closely related").

Of course, it is possible to define the class of products at too high a level of generality. For example, a company that makes computer games is unlikely to be confused with a company that offers "computer consulting" and "Internet access services," even though both could be categorized as part of the computer industry. *See Hasbro, Inc. v. Clue Computing, Inc.*, 232 F.3d 1, 2–3 (1st Cir. 2000). And although sugar and pizza are both eaten, single-serving packets of sugar and establishments at which pizza can be ordered occupy highly different spaces in the minds of consumers. *See Amstar Corp.*, 615 F.2d at 261. "Goods or services are 'related,' not because of any inherent common quality of the products, but 'related' in the sense that buyers are likely to believe that such goods or services, sold under similar trademarks, come from the same source or are connected with or sponsored by a common company." 3 McCarthy § 24:2.

That is the thrust of this digit. It is meant to ensure that courts consider situations in which "two products are so dissimilar as to make confusion highly unlikely." *Attrezzi, LLC v. Maytag Corp.*, 436 F.3d 32, 39

(5th Cir. 2006). "It would be hard, for example, for the seller of a steam shovel to find ground for complaint in the use of his trade-mark on a lipstick." *L.E. Waterman Co. v. Gordon,* 72 F.2d 272, 273 (2d Cir. 1934) (L. Hand, J.); *see also Aunt Jemima Mills Co. v. Rigney & Co.*, 247 F. 407, 409–10 (2d Cir. 1917) (flour and syrup are sufficiently related products even though "no one wanting syrup could possibly be made to take flour").

The district court found that Casa Azul's "canned tequila sodas are plainly dissimilar products" to Clase Azul's tequila. And although the bottled tequilas both have 40% alcohol content, the district court found them dissimilar because for each type of tequila—blanco, reposado, and añejo—Clase Azul's product costs between 2 to 5 times that of Casa Azul's product. Simply put, Clase Azul is a "luxury sipping tequila" while Casa Azul is an "organic, additive-free lower cost tequila."

Clase Azul contends that the district court erred in its analysis because: (1) the trial evidence showed that canned tequila soda and tequila are sufficiently related such that consumers are likely to think a similarly marked tequila soda and tequila come from the same source, and (2) the parties' distilled tequila is the same product for purposes of analyzing the likelihood of confusion—even where one product costs more.

We agree with Clase Azul and hold that the district court clearly erred in finding that the parties' products were dissimilar. Clase Azul characterizes the district court's errors as legal rather than factual, but we need not resolve that question. Even assuming the district court's analysis rested on legal error and *Capece* therefore permits *de novo* review, the standard of review does not affect the result. Under either *de novo* or clear-error review, the record supports only one conclusion as to the similarity-of-the-products digit: it favors a finding of likelihood of confusion.

Here, the district court's analysis concluded that "when considered within the context of the tequila market . . . the products themselves are not similar." But it was improper for the district court's analysis to home in solely on the context of the tequila market because the products "need not be in competition" and the products "need not be identical" to find that they are sufficiently similar under this digit. *Beef/Eater Restaurants, Inc.*, 398 F.2d at 639.

Clase Azul and Casa Azul both produce bottled, distilled tequila with an alcohol content of 40%. Under our case law, that fact alone is more than sufficient to conclude that the products are sufficiently similar for purposes of this digit. *See Beef/Eater Restaurants, Inc.*, 398 F.2d at 639 (a restaurant and a company that hand makes and vends gin are sufficiently similar); *Gruma Corp.*, 497 F. App'x at 398 (pre-packaged Mexican food and restaurant-sold Mexican food are sufficiently similar); *In re Majestic Distilling Co., Inc.*, 315 F.3d 1311, 1316 (Fed. Cir. 2003) ("malt liquor and tequila are similar goods and are sold in many of the same established and likely-to-continue trade channels").

The district court noted two distinctions between the tequilas: (1) Clase Azul tequila costs between 2 to 5 times more than Casa Azul tequila, and (2) Casa Azul is an organic, additive-free tequila while Clase Azul includes additives. These distinctions do not undercut the fact that both companies sell bottled tequila, and our precedent yields a conclusion that the bottled tequilas are similar products. *Beef/Eater Restaurants,* 398 F.2d at 639.

When comparing the same products at different price points under this digit, the question is whether the prices of the products are so different that a reasonable consumer would not think it plausible that plaintiff's product line would expand to the accused products. "A Michelin-starred

French restaurant is wholly different from a Chinese take-out restaurant." *Sorensen v. WD-40 Co.*, 792 F.3d 712, 729 (7th Cir. 2015).

But the price points of the products here are not so different that a consumer would think it implausible that they could be from the same source. Casa Azul's blanco, reposado, and añejo tequilas retail for $69.99, $89.99, and $129.99, respectively. Clase Azul's blanco, reposado, and añejo tequilas retail for $135–155, $165–185, and $530 respectively. Clase Azul's most popular tequilas are the blanco and reposado tequilas, together comprising approximately 75% of Clase Azul's sales. The añejo tequila comprises only 8% of Clase Azul's sales.

The gap in price narrows further when the products are purchased at bars and restaurants. Clase Azul's founder represented that at a high-end restaurant in Beverly Hills, a two-ounce shot of Clase Azul reposado was listed at $40 and Casa Azul was listed at $22. Moreover, Casa Azul identified Clase Azul as a competitor in internal documents. The difference in prices is not so drastic as to cause a reasonable consumer to believe that the two products could not plausibly come from the same source.

The organic and additive-free distinction also does not support that inference. The district court cited no evidence that consumers would find it implausible that a tequila producer like Clase Azul would expand its line to include an organic or additive-free product.

The district court likewise erred when it found that Casa Azul's "tequila sodas are plainly dissimilar products to [Clase Azul's] bottled tequila." Casa Azul's canned tequila sodas are similar enough under this digit because both contain tequila. *See Gruma Corp.*, 497 F. App'x at 398–99. Consumers could reasonably believe that Clase Azul had expanded its product line to include a tequila soda product. Indeed, "[w]hen products or services are noncompeting, the confusion at issue is one of sponsorship,

affiliation, or connection." *Elvis*, 141 F.3d at 202. "There is no simple, one-question test for determining whether noncompetitive products are 'related' such that confusion is likely as to source, affiliation, connection, or sponsorship." 3 McCarthy § 24:24. The inquiry therefore focuses on whether "a reasonable buyer is likely to think that [the] defendant's goods . . . are somehow connected with, or sponsored by, the plaintiff." *Id.* "The danger of affiliation or sponsorship confusion increases when the junior user's market is one into which the senior user would naturally expand." *Elvis*, 141 F.3d at 202.

Importantly, consumer perception, rather than the senior user's intent to expand, is the controlling factor. "If consumers believe, even though falsely, that the natural tendency of producers of the type of goods marketed by the prior user is to expand into the market for type of goods marketed by the subsequent user, confusion may be likely." *Id.* It is entirely plausible that a tequila brand would expand into the tequila soda market. "[T]estimony that third-party companies sell both types of goods is pertinent to the relatedness of the goods." *Naterra Int'l, Inc. v. Bensalem*, 92 F.4th 1113, 1117 (Fed. Cir. 2024). The record shows that other liquor brands sell both a liquor product and a ready-to-drink soda with the spirit, such as Jack Daniel's, Crown Royal, Smirnoff, Bacardi, Jimador Tequila, and Cazadores. Just as Casa Azul expanded from selling canned tequila sodas to selling bottled tequila, it is likewise conceivable that Clase Azul would expand from selling bottled tequila into the tequila soda market.

Accordingly, we hold that the district court clearly erred when it found that the parties' products were dissimilar.

D

We continue our likelihood of confusion analysis with the "disparity in consumers and stores." Where there is disparity in consumers and stores,

there is less likelihood of confusion. *Streamline Prod. Sys.*, 851 F.3d at 455. And by contrast, the greater the overlap in where the goods are sold and to whom, the greater the likelihood of confusion. *Viacom*, 891 F.3d at 194. When the same buyers shop in the same places, the marks are more likely to be encountered by a person already carrying a mental impression of the senior mark, increasing the probability of triggering a mistaken association. Conversely, when the customer bases and sales channels diverge, the two marks rarely meet in the same consumer's experience, and the opportunity for confusion shrinks accordingly.

Context is exceptionally important in this digit. If there is a shared consumer base, the fact that the goods are not sold in the same store or same section can *heighten* the likelihood of confusion. In that situation, the consumer has no opportunity to inspect the goods side by side and notice the distinctions that a direct comparison would reveal, so they must rely on memory of the senior mark when they encounter the junior one. *See La. World Exposition, Inc. v. Logue*, 746 F.2d 1033, 1041 (5th Cir. 1984) (noting that "[t]he fact that the same exact stores do not carry both parties' merchandise enhances the likelihood of confusion").

Clase Azul argues that the district court clearly erred when it: (1) found that Clase Azul was not sold in big box liquor stores or grocery stores, (2) found that Casa Azul is sold in special sections of liquor stores, (3) found that the parties have dissimilar consumer bases, and (4) incorrectly placed emphasis on store placement.

As for the identity of retail outlets, the district court found that the store base was not similar enough to contribute to a likelihood of confusion finding for two reasons. *First*, the district court found that Clase Azul products "are not sold in grocery stores or in big box stores, while the defendant's products are sold in those outlets." *Second*, the district court

found that "even when the products are sold in the same stores," Casa Azul "is sold either in a designated organic or additive-[free] section, or next to other tequilas in a similar price range, like Casamigos." The district court found that Clase Azul, by contrast, is often in locked displays.

The district court's finding that Clase Azul is not sold in grocery stores or big box stores is clearly erroneous. Clase Azul is sold at grocery stores such as Kroger, Ralphs, and Safeway, and it is sold in big box liquor stores such as Total Wine & Spirits and Spec's. The district court repeated this erroneous finding at least three times in its order. The record evidence is clear that Clase Azul and Casa Azul both sell their tequila products in grocery and big box stores, which increases the likelihood of confusion between the two brands. *Streamline Prod. Sys.*, 851 F.3d at 455.

We do not disturb the district court's finding that "even when the products are sold in the same stores," Casa Azul "is sold either in a designated organic or additive-[free] section, or next to other tequilas in a similar price range, like Casamigos." Clase Azul argues that there is not sufficient evidence to conclude that Casa Azul is sold in a designated organic or additive-free section of stores. But Jorge Llauro, Casa Azul's Chief Marketing Officer, testified that "some stores have sections for organic tequilas or additive-free tequilas." In response to being asked where Casa Azul would be sold in those stores, Llauro testified, "We would want to be in the organic or additive-free section." Clase Azul emphasizes the "we would want" qualifier, which it takes to mean that there was no basis for the district court to conclude that Casa Azul is located in a special section. Because there was no cross-examination on the point, we are satisfied that the district court as fact finder could properly infer that Casa Azul's tequila is sometimes sold in a designated organic or additive-free section.

Clase Azul does not separately challenge the district court's conclusion that when Casa Azul is not in a designated organic section, it is sold "next to other tequilas in a similar price range." Rather, Clase Azul argues that "the inability to compare the products side by side and observe the precise differences in appearance may increase the likelihood of confusion." *Sun-Fun*, 656 F.2d at 192.

For example, in *Louisiana World Exposition, Inc. v. Logue*, the products at issue—similar, inexpensive souvenirs like tee shirts and caps—were sold in the same types of small shops to tourists in the same market area, but not in the exact same stores. 746 F.2d at 1041. We held that "[t]he fact that the same exact stores do not carry both parties' merchandise enhances the likelihood of confusion." *Id.*

Query why, then, Clase Azul would have pressed the district court to find that its products are sold in the same stores as Casa Azul. In any event, Casa Azul argues that Clase Azul forfeited this argument by not making it to the district court.[13] The district court is in the best position to determine whether this argument was forfeited and, if it was not forfeited, whether the principle of *Louisiana World Exposition* is apt in this context. *See Sun-Fun Prods.*, 656 F.2d at 192 (finding lack of proximity increased likelihood of confusion when products sold "to the same general class of consumers").

---

[13] Casa Azul states in its brief that Clase Azul "waived" its argument by not making it to the district court. But we think the argument is actually that Clase Azul forfeited the argument. "The terms waiver and forfeiture—though often used interchangeably by jurists and litigants—are not synonymous." *Hamer v. Neighborhood Hous. Servs. of Chi.*, 583 U.S. 17, 20 n.1 (2017). "Whereas forfeiture is the failure to make the timely assertion of a right, waiver is the intentional relinquishment or abandonment of a known right." *Rollins v. Home Depot USA*, 8 F.4th 393, 397 (5th Cir. 2021) (quoting *United States v. Olano*, 507 U.S. 725, 733 (1993)). A party "forfeits an argument by failing to raise it in the first instance in the district court—thus raising it for the first time on appeal." *Id.* (citing *United States v. Zuniga*, 860 F.3d 276, 284 n.9 (5th Cir. 2017)).

Turning to the similarities in consumer base, Clase Azul describes its target consumer as the "conscious connoisseur." Clase Azul targets older, affluent and high-net-worth individuals. The starting suggested retail price of Clase Azul is $135 for its tequila plata and ranges to upwards of $2,000 for the Ultra product. The range for a two-ounce shot at a bar or restaurant is between $35 and $475.

Casa Azul does not have any data about the demographics of its consumers. For its bottled tequilas, Casa Azul focuses on the fact that its tequilas are certified organic by the United States Department of Agriculture, additive-free and single-estate. Casa Azul's blanco, reposado, and añejo tequilas retail for $69.99, $89.99, and $129.99, respectively. Casa Azul has likewise referred to itself as a "luxury brand." Moreover, Casa Azul identified Clase Azul as a competitor in internal documents.

Casa Azul's canned tequila soda cocktails appeal to young, health-conscious consumers shopping for casual events like barbecues, pool parties, and tailgates. Clase Azul does not intend to enter the "ready-to-drink" market. However, it is sometimes asked if it is considering it.

Because Casa Azul does not have demographic data about its customers, there is less of a basis to determine whether and to what degree the consumer base differs. And the district court's finding that the consumer base between the products differed depended on differences in retail outlets and store placement. Accordingly, the district court on remand should reconsider its finding that the consumer bases are not similar.

We vacate the district court's finding on this digit for reconsideration in light of the fact that both products are sold in grocery and big box stores.

E

Our analysis continues with the "similarity of advertising and media identity" digit. "The greater the similarity in the [advertising] campaigns, the greater the likelihood of confusion." *Streamline Prod. Sys.*, 851 F.3d at 455 (quoting *Exxon Corp.*, 628 F.2d at 506). This factor considers the method of advertising and the target markets. *Exxon Corp.*, 628 F.2d at 506.

We have previously looked at how parties direct advertising expenses when determining whether there is similarity between the advertising identities of two brands. *Rex Real Est.*, 80 F.4th at 623 (observing that "while both companies use signage, print advertisements, and radio spots to a limited extent, the lions' share" of their advertising budgets do not go to the same sorts of ad campaigns). Where the evidence demonstrates that one party engages in "minimal advertising, this digit is 'minimally probative' of likelihood of confusion." *Streamline Prod. Sys.*, 851 F.3d at 455 (quoting *La. State Univ.*, 550 F.3d at 481).

Clase Azul challenges the district court's finding as to this digit, arguing that both parties advertise on social media, celebrate Mexican heritage, and target luxury consumers. But Clase Azul's Chairman, Juan Sanchez, testified that Clase Azul generally does not advertise. Instead, the company relies on "unpaid organic media" and does not pay for TV spots or ads, magazine ads, or billboards. In contrast, Casa Azul advertises through paid influencer partnerships, events, and field marketing.

The district court found that "the parties' advertising is highly dissimilar" because Casa Azul capitalizes on the "Casa" portion of its mark and "markets to a younger, more 'hip' market," whereas Clase Azul rarely advertises and otherwise focuses on Mexican culture, its artisans, and luxury products "targeted toward high net-worth individuals." Because Clase Azul engages in minimal advertising while Casa Azul Spirits engages in paid

advertising campaigns, the district court did not clearly err when it weighed this digit against a likelihood of confusion.

F

We turn next to the "actual confusion" digit and hold that the district court erred in its analysis of this digit. "Actual confusion . . . is the best evidence of a likelihood of confusion." *Xtreme Lashes*, 576 F.3d at 229 (5th Cir. 2009) (internal quotation marks omitted). Showing actual confusion is "a low bar." *Streamline Prod. Sys.*, 851 F.3d at 457–58. A plaintiff may show actual confusion using anecdotal instances of consumer confusion, consumer surveys, or both. *Scott Fetzer Co. v. House of Vacuums, Inc.*, 381 F.3d 477, 486 (5th Cir. 2004). But the "[e]vidence of actual confusion must show 'more than a fleeting mix-up of names.'" *Streamline Prod. Sys.*, 851 F.3d at 457 (quoting *Xtreme Lashes*, 576 F.3d at 230).

We first discuss the survey evidence here and then turn to the anecdotal evidence of confusion.

1

Clase Azul does not challenge the district court's finding that Casa Azul's survey was reliable and that Clase Azul's survey was not. But we briefly discuss the survey evidence because we must consider it in conjunction with any evidence of actual confusion to determine whether the district court's finding on this digit was clearly erroneous.

Casa Azul conducted two consumer perception surveys: one to assess whether consumers of ready-to-drink canned cocktails would mistakenly believe that Casa Azul tequila soda is made by or associated with Clase Azul, and another to measure whether adults likely to encounter Casa Azul's bottled tequila are likely to mistakenly believe that Casa Azul tequila is made by or associated with Clase Azul. For both surveys, Casa Azul's expert used

the *Eveready* methodology for assessing likelihood of confusion. In the *Eveready* survey format, the respondent is shown the accused product and asked an open-ended question: "Who do you believe makes or puts out this product?" Casa Azul's surveys showed that less than one percent (0.33%) of consumers believed that Casa Azul tequila soda came from, was affiliated with, or was sponsored by Clase Azul. As for the bottled tequila products, 1.70% of consumers believed that Casa Azul's product came from, was affiliated with, or was sponsored by Clase Azul. The court credited Casa Azul's survey and determined it did not show a likelihood of confusion because confusion was "far below the 10% threshold used to measure likelihood of confusion."

Clase Azul conducted a survey of its own using a "modified" *Squirt* methodology to test the likelihood of confusion for Casa Azul's canned tequila soda products. Clase Azul did not conduct a survey for Casa Azul's *bottled* tequila product. The *Squirt* methodology shows the respondent both conflicting marks and asks if the respondent believes that the products are from the same source. 5 McCarthy § 32:174.50. Casa Azul's rebuttal expert opined that the *Squirt* methodology is accurate only when the marks appear proximately in the marketplace. And the *canned* tequila soda products would not be in the same section as the bottled tequila.

Clase Azul's survey had a slew of other problems as well. The survey only showed the two products and showed the Clase Azul bottle outside and next to its box, with the back of the bottle facing the consumer. Moreover, the control group product did not contain the word "Azul," and the questions were improperly leading. Even Clase Azul candidly acknowledged that its survey had "some flaws" but nevertheless urged that it was "entitled to some weight."

The district court found that the survey evidence did not show a likelihood of consumer confusion. Clase Azul does not challenge this finding on appeal.

2

Without competent survey evidence showing a likelihood of confusion, Clase Azul is left to rely on anecdotal evidence of confusion. Proof of "swayed customer purchases" is not strictly required to show actual confusion. *Rex Real Est.*, 80 F.4th at 624. And when there are instances of swayed customer purchases, "very little proof is required." *Id.* at 625; *see La. World Expo.*, 746 F.2d at 1041 (affirming finding of actual confusion with testimony of a single customer who "bought one of the Defendants' T-shirts thinking it was made by the Plaintiff").

But here, the district court found "no evidence of swayed purchases"—that is, evidence that a consumer purchased Casa Azul intending to purchase a product made by Clase Azul. And when there is no evidence of swayed purchases, "more is required," and the evidence "should be weighed against the parties' total volume of sales" and "the extent of the parties' advertising." *Rex Real Estate*, 80 F.4th at 625.

In addition, "isolated instances of uncertainty [about] whether there [is] a connection between the two businesses" have "more weight if it is a potential customer considering whether to transact business with one or the other." *Id.* This is especially so where the plaintiff demonstrates initial-interest confusion, that is, instances where "potential customers of [the] plaintiff . . . interested in [the plaintiff's product] . . . walked in[to] [the] defendant's door because they were confused as to affiliation." *Id.* at 626. At the same time, "proof of actual confusion is not limited to actual or potential customers." *Id.* at 627.

We have held this digit satisfied as a matter of law, or reversed a judgment entered for a defendant after a bench trial, when a trial court did not give the evidence the weight that our precedent requires.

In *World Carpets, Inc. v. Dick Littrell's New World Carpets*, uncontradicted testimony established that retailers had called the plaintiff, a wholesaler distributor of carpets, believing that it had entered the retail market because the defendant was a carpet retailer. 438 F.2d 482, 489 (5th Cir. 1971). Discerning no "evidence to refute the clear inference created by this proof of actual confusion," we held that the evidence "pointed so strongly in favor of a finding of confusion that the minds of reasonable men could not have arrived at a contrary decision," and that a directed verdict was therefore proper. *Id.* And in *American Century Propriety Holdings, Inc. v. American Century Casualty Co.*, we found six specific incidents of misdirected calls and correspondence sufficed for the factor to weigh slightly in favor of the plaintiff as a matter of law given the parties' "lines of business" as insurance providers. 295 F. App'x 630, 638 (5th Cir. 2008).

We have likewise reversed defense judgments after bench trials when the district court committed legal error in its treatment of actual-confusion evidence. In *Fuji Photo Film Co. v. Shinohara Shoji Kabushiki Kaisha*, the trial court believed that only confusion among ultimate purchasers was relevant and discounted its own findings of confusion among distributors and trade-show visitors. 754 F.2d 591, 597 (5th Cir. 1985). We reversed, holding that "[i]n no case have we sanctioned total disregard of evidence of actual confusion . . . regardless of the identity of the person confused." *Id.*

Clase Azul maintains that the district court erred in its analysis of this digit in various ways: (1) the district court gave no weight to a significant amount of actual confusion evidence; (2) the district court mischaracterized the actual confusion that Clase Azul experienced; (3) the district court

discounted confusion related to job inquiries; (4) the district court did not give weight to actual confusion with online retailers; (5) the district court's conclusion that the evidence of actual confusion on social media was "common" is not supported by the evidence; (6) the district court erroneously found that Clase Azul's evidence of actual confusion was merely "isolated instances of uncertainty"; and (7) the district court did not consider initial-interest confusion.

The district court acknowledged some of the evidence that Clase Azul presented regarding actual confusion. The district court acknowledged an instance in which a job applicant asked Clase Azul about a job that was posted by Casa Azul. The district court likewise acknowledged that Clase Azul's employees were sometimes contacted to ask if they knew Casa Azul's employees. Finally, the district court mentioned that social media users had tagged photos of Clase Azul products with Casa Azul's account.

But there was a significant amount of evidence of actual confusion that the district court did not mention. Clase Azul's Vice President of the West testified that, when having a drink with an employee of an alcohol distributor, the employee thought that "Casa Azul" was a "new line extension" of Clase Azul. The same Vice President received a text message from a bar owner asking if Casa Azul tequila was a new product sold by Clase Azul.

There was at least one instance in which a person contacted Casa Azul requesting to speak about or purchase Clase Azul products. On a separate occasion, Casa Azul's founder had to correct an acquaintance who mistakenly thought that Casa Azul was a Clase Azul product. After informing the acquaintance of celebrities that Casa Azul had contracted with, the acquaintance responded: "We need Casa Azul in our house! I got them into the Rosewood Mayakoba as the signature in room tequila many years ago. Love it!!" Casa Azul's founder informed his acquaintance that Casa

Azul had not yet been released, and she replied: "Ah, you're right, Clase Azul."

Casa Azul's Chief Marketing Officer contacted an individual at a video production company regarding engagement of the company's services. Before the launch of Casa Azul, the individual responded noting that he was a fan of the tequila and brand, that he sent the tequila as a holiday gift at his company, and that he had "just tried the Casa Azul mezcal for the first time a few weeks ago, some of the most beautiful bottles hands down."

Similarly, Casa Azul's Vice President of Operations had to correct an employee of a packaging company who stated that Casa Azul was her "favorite tequila" despite the tequila not having launched yet. Casa Azul's Vice President corrected her, noting that she had to be "talking about Clase Azul."

Clase Azul also presented evidence that consumers confused Casa Azul and Clase Azul tequilas on wholesale websites, such as Total Wine, where a consumer of Casa Azul left a two-star review on a Clase Azul tequila complaining that the tequila is "a joke" and "overrated." The consumer uploaded a photo of Casa Azul tequila with the review, indicating confusion between the two products. Alcoholic beverage retailers have also mislabeled or misregistered Casa Azul products as Clase Azul.

These instances of confusion are not isolated incidents. They reveal real confusion in the market—both by consumers *and* by distributors who know this market well. Based on these facts, the district court clearly erred in its analysis of actual confusion because it failed to adequately consider instances of confusion and ignored record evidence of consumer confusion. *See Rex Real Est.*, 80 F.4th at 624 (reversing grant of summary judgment where there was some evidence of consumer confusion that the district court failed to consider).

On remand, the district court should consider each of these instances of actual confusion and reweigh those instances against the survey evidence. On this record, we hold that this digit must cut in favor of a likelihood of confusion, but we leave the weight to be given this digit to the district court on remand. *See Am. Century Casualty Co.*, 295 F. App'x at 638 (six instances of actual confusion at least led to this factor slightly weighing in favor of likelihood of confusion).

G

The final digit in our likelihood of confusion analysis is the "degree of care exercised by purchasers." The degree of care exercised by purchasers "look[s] to both the kind of goods or services offered and the kind of purchasers." *Rex Real Est.*, 80 F.4th at 627. And this digit is often linked to the price of the product. *Streamline Prod. Sys.*, 851 F.3d at 458. Buyers may take relatively less care in selecting inexpensive items, which may increase the risk of confusion, whereas buyers may take greater care in selecting higher priced items. *Id.* But "a high price tag alone does not negate other [digits of confusion], especially if the goods or marks are similar." *Id.* (quoting *Xtreme Lashes*, 576 F.3d at 231).

Clase Azul contends that the district court did not consider the prices of Casa Azul's products or the prices of both parties' products at bars and restaurants in its analysis of this digit.

Here, the district court found that "when . . . the prices of the products range from hundreds to thousands of dollars, the consumers of the products can be presumed to exhibit some amount of care in their decisions." At the same time, the district court acknowledged that "this factor is not particularly strong in light of the other digits, but weighs slightly against finding a likelihood of confusion." We hold that the district court's analysis of this digit was not clearly erroneous.

### H

At the end of its analysis, the district court concluded that when "there is no evidence of actual confusion or swayed consumer purchases, and the marks are for dissimilar products in a crowded market, there is not a likelihood of confusion between the products." But because the district court erred in its analysis of the strength of the CLASE AZUL mark, the similarity of the products, disparity in consumers and stores, and actual confusion, we also hold that the district court's ultimate conclusion rests on erroneous findings. Because of these errors, we VACATE the district court's judgment and REMAND for proceedings consistent with this opinion.

## IV

Finally, we turn to Clase Azul's challenges to two pre-trial evidentiary rulings made by the district court. Clase Azul contends that the district court abused its discretion in limiting Clase Azul's proposed actual-confusion witnesses and by refusing to allow Clase Azul to conduct a likelihood of confusion survey on Casa Azul's bottled tequila product that launched while the case was pending.

"We review a district court's evidentiary rulings for abuse of discretion." *Jowers v. Lincoln Elec. Co.*, 617 F.3d 346, 355 (5th Cir. 2010). And we must decide whether the cumulative effect of the district court's decisions and conduct amounted to an abuse of the court's broad discretion. *Taylor-Travis v. Jackson State Univ.*, 984 F.3d 1107, 1114 (5th Cir. 2021).

### A

We begin with Clase Azul's challenge to the district court's limitation of its witnesses. Federal Rule of Civil Procedure 26(a) requires parties to disclose the name and contact information of "each individual likely to have

discoverable information" that "the disclosing party may use to support its claims or defenses." Federal Rule of Civil Procedure 26(e) in turn requires "[a] party who has made a disclosure under Rule 26(a)" or "who has responded to an interrogatory" to "supplement or correct its disclosure or response . . . in a timely manner." Fed. R. Civ. P. 26(e). Federal Rule of Evidence 403 permits a district court to "exclude relevant evidence" if its "probative value is substantially outweighed by a danger of . . . undue delay, wasting time, or needlessly presenting cumulative evidence." *See United States v. Haynes*, 554 F.2d 231, 234 (5th Cir. 1977) (analyzing trial court's limitation on number of witnesses based on cumulative testimony under Rule 403); *see* Fed. R. Evid. 611(a) (granting trial court "reasonable control over the mode and order of examining witnesses and presenting evidence").

The fast-paced schedule of this case is pertinent to Clase Azul's disclosure of actual-confusion witnesses five weeks before the close of discovery. Clase Azul filed this action on September 1, 2022, and moved for a preliminary injunction on October 19, 2022. The parties submitted a joint discovery and case management plan on November 18, 2022, in which Clase Azul asserted that "[a]t least thirty incidents of actual confusion have already occurred," referring to the Instagram mis-tagging. The parties proposed—and the district court ordered—an ambitious deadline of June 9, 2023, for discovery. The parties exchanged initial disclosures on November 30, 2022.

On May 2, 2023, Clase Azul served amended initial disclosures that listed 46 new persons having "knowledge regarding actual confusion." The following day, the court and the parties discussed these disclosures at a conference. Clase Azul asserted that it had located additional actual-confusion evidence when reviewing the discovery that was "pulled responsive to search terms that defendant provided to us"—in other words, documents in Clase Azul's possession. The newly disclosed individuals fell into three categories: employees of Clase Azul, employees of Clase Azul's

distributor, and third parties that communicated with individuals in the first two categories.

The district court allowed Clase Azul to depose two of the newly identified individuals. Any more would be unnecessary, the district court noted, because there would be "a way to get in the communications" such that Clase Azul would not need to "call all the parties to the communications."

Clase Azul has not shown that any failure to introduce actual confusion into the record was due to the district court's limitation of its depositions or trial witnesses. Clase Azul identified each of those individuals because he or she "had sent and received communications showing confusion." Clase Azul has not shown that the district court's limiting of witnesses kept it from introducing its documentary evidence of actual confusion. Indeed, Clase Azul was permitted to introduce deposition testimony from a corporate representative of its distributor describing documents that Clase Azul contended showed actual confusion.

B

Clase Azul next asserts that the district court abused its discretion in denying an extension of the discovery deadline for Clase Azul to conduct a survey on Casa Azul's bottled tequila. Clase Azul contends that "there was plenty of time" as "the dispute went to trial eight months after Plaintiff requested a mere three weeks to conduct the additional survey."

It was no secret that Casa Azul had a plan to launch a bottled tequila product in addition to its tequila soda product. Clase Azul's complaint filed in September 2022 referenced such a plan. And at the December 2022 preliminary injunction hearing, Clase Azul acknowledged that it knew that

Casa Azul planned to launch a bottled tequila product with the CASA AZUL mark.

In January 2023, Casa Azul provided Clase Azul with images of its bottled tequila product and informed Clase Azul that the bottles were "just delivered to Mexico and that they were going to be filled next week." Importantly, Clase Azul did not at that time request an extension of its March 10, 2023 deadline to provide its expert report. Rather, Clase Azul's survey expert finalized her report on March 9.

On March 29, 2023, Casa Azul publicly announced that it was expanding its product line to include the bottled tequila products. On April 10, 2023, Casa Azul's deadline to serve expert reports, Casa Azul served its survey expert's report. Casa Azul's expert conducted a survey from March 11 to March 31, 2023.

Then, on April 25, 2023, Clase Azul requested an extension of the expert discovery deadlines so that its expert could conduct a survey on the bottled tequila product. Clase Azul asserted that it was "impossible" for its expert to "conduct a survey on Defendant's CASA AZUL tequila prior to Plaintiff's expert designation deadline" because Casa Azul did not announce its bottled tequila product until "almost three weeks after Plaintiff's expert deadline."

Casa Azul maintained that Clase Azul "had pictures of the tequila as early as January of this year, which it could have used (as Defendant did) for a survey on the bottles." Casa Azul also pointed out that Clase Azul could have notified Casa Azul to not serve its survey and rebuttal reports on April 10 because Clase Azul needed more time to conduct a survey on the bottled product.

On these facts, we cannot say that the district court abused its discretion in denying Clase Azul's request for an extension to conduct a

survey where there was no good cause to do so. *Batiste v. Lewis*, 976 F.3d 493, 500 (5th Cir. 2020).

## V

Our review of the seven disputed digits reveals error in several important respects. As to the strength of the mark, the district court clearly erred in classifying the mark as descriptive rather than suggestive and in finding that CLASE AZUL did not have strong standing in the marketplace. The district court's third-party use analysis rested on an erroneous legal premise. These issues must be reconsidered on remand.

The district court's assessment of the similarity of the marks was not clearly erroneous, but its conclusion as to the similarity of the products was. The district court's analysis of the identity of consumers and retail outlets was infected by the clearly erroneous subsidiary finding that the parties' products are not both sold in grocery and big box stores. The district court neither erred in finding a lack of media or advertising identity nor in its findings regarding the degree of care exercised by consumers.

Finally, the district court's actual-confusion analysis failed to account for substantial evidence of actual confusion. On remand, the district court must consider that evidence and weigh it against the survey evidence. The actual-confusion digit must weigh in favor of a likelihood of confusion, though the district court must determine in the first instance how strongly it does so. Then, the district court must reassess the ultimate likelihood-of-confusion finding in light of these conclusions. *See Beatriz Ball, L.L.C. v. Barbagallo Co.*, 40 F.4th 308, 320 (5th Cir. 2022) ("The sum of errors in the district court's analysis of secondary meaning requires reconsideration of the evidence and overall re-weighing of the factors in accordance with this opinion.").

Based on the foregoing, we VACATE the district court's judgment finding a lack of likelihood of confusion and REMAND to the district court for proceedings consistent with this opinion. We AFFIRM the judgment of the district court on the disputed evidentiary and discovery rulings.

KURT D. ENGELHARDT, *Circuit Judge*, concurring in part and dissenting in part:

The majority vacates the district court's judgment finding a lack of likelihood of confusion, and remands to the district court because of "errors" in the district court's analysis of four of the eight digits of confusion. I disagree. I would affirm the district court's finding that there is no likelihood of confusion between Plaintiff's and Defendant's word marks. Considering our precedent and the evidence presented, I do not think the district court clearly erred on any of the eight digits of confusion. Therefore, I respectfully dissent from Part III of the majority opinion.

In my view, the majority is incorrect in two respects: it (1) misapplies the clear-error standard of review, and (2) misconstrues several of the likelihood-of-confusion digits, namely those where it finds clear error: type of mark, similarity of products, disparity in consumers and stores, and actual confusion. Accordingly, I start with a backdrop of the standard of review. Then, I address each of those four digits in turn against that backdrop.

I.

This appeal follows a five-day bench trial in which the district court heard at least 12 witnesses, reviewed thousands of pages of exhibits, and made detailed findings on each of the eight likelihood-of-confusion digits. Federal Rule of Civil Procedure 52 governs a district court's findings of fact and conclusions of law in a bench trial. As the majority points out, "[l]ikelihood of confusion is a question of fact." *Viacom Int'l*, 891 F.3d at 192. Subsection (a)(6) of Rule 52 provides that "findings of fact . . . must not be set aside unless clearly erroneous."

The clear-error standard of review requires deference to the district court's findings. *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 574 (1985). This means "[w]e construe the evidence in the light most favorable

to upholding the district court's finding." *Cox v. City of Dall.*, 430 F.3d 734, 747 (5th Cir. 2005). "If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." *Anderson*, 470 U.S. at 574. Thus, where "there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Id.* "This is so even when the district court's findings do not rest on credibility determinations, but are based instead on physical or documentary evidence or inferences from other facts." *Id.*

So, in sum, a district court's finding is clearly erroneous if it is implausible or without support in inferences from the record. *Cf. Anderson*, 470 U.S. at 574. A finding is also clearly erroneous, however, when, although there is evidence to support it, "we are left with the definite and firm conviction that a mistake has been committed." *Id.* at 573. But that is where the clearly erroneous standard of review starts and ends. It does not permit the appellate court to set aside the district court's findings based on "the mere fact" that "the appellate court might have reached a different result" "on the same evidence." 9C Wright & Miller's Federal Practice & Procedure § 2585 (3d ed. 2008). With that understanding of the standard of review in mind, I turn to the digits of confusion in contention.

## II.

### A.

First consider the type, or strength, of the mark. When evaluating confusion under this digit, we consider (a) where the mark falls on a spectrum of distinctiveness (conceptual strength) and (b) the mark's standing in the marketplace (commercial strength), as well as (c) evidence of third-party use of similar marks on similar goods.

i.

When assessing a mark's conceptual strength—or where the mark falls on a spectrum of distinctiveness—context is critical: "In categorizing a term, we must examine the context in which the term is used." *Nola Spice Designs, L.L.C. v. Haydel Enters., Inc.*, 783 F.3d 527, 537 (5th Cir. 2015) (citing *Union Nat'l Bank of Tex., Laredo v. Union Nat'l Bank of Tex., Aus.*, 909 F.2d 839, 847 (5th Cir. 1990)). That is, "[w]e consider 'how [the term] is used with other words,' 'the products or services to which it is applied,' and 'the *audience* to which the relevant product or service is directed.'" *Id.* (quoting *Union Nat'l Bank of Tex.*, 909 F.2d at 847). The pertinent inquiry is "what do buyers understand by the word for whose use the parties are contending?" *Id.*; *see also In re Gyulay*, 820 F.2d 1216, 1217 (Fed. Cir. 1987) (acknowledging that "the trademark attribute of descriptiveness vel non is determined from the point of view of the purchaser").

This means that CLASE AZUL, or "blue class," must be understood in the context of tequila and from the point of view of tequila purchasers—not in the universe of all things, or even more narrowly, of all drinks, involving blue, as the majority suggests. The relevant question is: "What do buyers *of tequila* understand CLASE AZUL to mean?" And purchasers looking for tequila in the alcohol aisle of the grocery store or while perusing the drink menu at a restaurant will not have to make mental leaps over "blue raspberry flavored soft drink" or "Kelley Blue Book" or even "blue curaçao" to understand that "azul" represents the blue Weber agave plant from which tequila is made.

Clear guidance on this principle is provided in *In re Gyulay*. In *Gyulay*, the Federal Circuit affirmed the Trademark Trial and Appeal Board's finding that APPLE PIE was descriptive of potpourri. 820 F.2d at 1218. Citing *Zatarains*, the court found sufficient that APPLE PIE "describes the scent,

when potpourri is sold for and by its scent." *Id.* "[P]urchasers would be 'immediately conveyed' knowledge of the scent of apple pie, on viewing the term APPLE PIE in association with potpourri, a product sold for its scent." *Id.* at 1217.

Just as potpourri is sold for and by its scent, tequila is sold by its plant source, the blue Weber agave plant. In fact, it can be sold only as tequila if it comes from the blue Weber agave plant. The fact that so many tequila brands use "azul" in their name only reinforces this. As Casa Azul's Chief Marketing Officer testified, "In tequila, Azul represents the [b]lue Weber agave . . . . So that's why you see a lot of tequilas—like, Flecha Azul uses Azul because it kind of is a reference to—to the agave they used inside." Meanwhile, "clase," or "class," denotes status or prestige. So, "blue class" conveys that Plaintiff's tequila is a "higher class" of tequila, a "premium product[]." Indeed, the President of Clase Azul Spirits agreed that "Clase Azul is easily understood to translate as, quote blue class . . . . connoting prestige and royalty." Therefore, the district court's finding that the mark is descriptive because it "describe[es] the type of alcohol, and the higher class of tequila, contained in its brand" is entirely plausible.[1]

It is unclear whether the majority finds clear error under this subfactor because it finds the district court's descriptive finding implausible in light of the record or because the majority finds that the district court's finding was based on a "definite and firm conviction that a mistake has been committed."

---

[1] The "hazy border" between the suggestive and descriptive classifications almost precludes a clearly erroneous finding. If the "[b]oundary between suggestive and descriptive words is not clear," how can it be "clear" that a mistake has been committed? 1 McCarthy on Trademarks and Unfair Competition § 11:66 (5th ed. 2024) (explaining that "the border line between descriptive and suggestive terms is a crucial one," yet "not clear. . . . The descriptive category almost imperceptibly shades over at one edge into the suggestive domain").

If the latter, then the majority goes through great hoops to show that a "mistake" was committed. If the mistake was so obvious in the sense that it leaves the majority with a "definite and firm conviction," then it would hardly need analogizing to seven-plus cases to show it. In any event, both descriptive and suggestive marks are "comparatively weak." *Future Proof*, 982 F.3d at 292 (citing *Sun Banks*, 651 F.2d at 315). Therefore, even if the district court erred in making that initial classification, its ultimate conclusion that CLASE AZUL is weak is not necessarily erroneous. *See id.*

ii.

Turning to commercial strength: when analyzing the strength of a word mark with no stylized wording or design, it is the words themselves that matter. *See All. for Good Gov't*, 901 F.3d at 503 n.1 ("A 'word mark' refers to [a] mark comprised *only of words*, while a 'design mark' refers to a mark comprised of symbols."(emphasis added)); *Nola Spice Designs*, 783 F.3d at 538–42 (analyzing the word and design marks separately). Indeed, duration of use, advertising efforts, sales numbers, and consumer recognition of the mark are applied to the marks themselves or to products bearing the marks. *See Sun-Fun Prods.*, 656 F.2d at 190–91 (finding that duration of use and extent of promotion may show strength of trademark, where the trademark was registered and "*had appeared on plaintiff's products* for at least seven to eight years" and plaintiff had "spent substantial sums of money promoting the . . . *trademark*" (emphasis added)); *Bose Corp.*, 293 F.3d at 1371 (explaining that "fame of a mark" "may be measured indirectly, among other things, by the volume of sales and advertising expenditures of the foods *traveling under the mark*" and assessing duration of use, sales, and promotion where mark "*appear[ed] on the product and its packaging*" (emphasis added)); *All. for Good Gov't*, 901 F.3d at 510 ("[A]s to the standing of Alliance's mark in the marketplace, it is undisputed that Alliance has *used its mark* for some

fifty years to promote candidates in yearly elections in a variety of Louisiana advertising media." (emphasis added)).

The question then is whether the word mark itself has commercial strength. As the district court explained in its factual findings and conclusions of law, Plaintiff's own internal documents and testimony indicate it does not.

When discussing possible participation in a promotional event, Plaintiff's marketing manager explained that Clase Azul would use a logo exclusively designed for event sponsorship "instead of just the Clase Azul tequilas logo, *which not everyone recognizes*." Because the logo lacked recognition, Clase Azul would need to pair the specialized event logo "together with the illustration of the bottle, making it easier to identify." As Clase Azul Co-Founder Arturo Lomelí explained in an internal email, "[T]he push comes from the ceramic bottles, since they are the most easily recognizable." His business partner, Juan Sanchez, conceded in his deposition and at trial that "some consumers might recognize or know [the Clase Azul] product when they see the bottle, but they don't necessarily know that the name is Clase Azul." And while they might recognize the bottle "in the music video or some of the influencer posts" shown at trial, "they don't necessarily know the name of the product." Further, Lomelí agreed that the CLASE AZUL label is displayed on the side of the bottle with a removable sticker because "it doesn't look beautiful with the name showing." While Clase Azul products are sometimes sold in boxes that display the mark, this is by no means standard practice. As Lomelí conceded, he was "aware that stores display [the] Clase Azul bottles outside the box" where the mark cannot be seen and that bars do so as well.

Because the CLASE AZUL mark is often absent, it is unclear whether the sales data the majority points to is driven by the word mark itself or by

Plaintiff's distinctive bottles.[2] Duration of use and consumer recognition are likewise unreliable. Moreover, the majority fails to mention advertising efforts, which are important where the district court found that "plaintiff does not generally advertise its product." Instead, Plaintiff "rel[ies] a lot on . . . unpaid organic media." And those "media mentions are largely focused on the plaintiff's distinctive bottle—not its name."

The district court accordingly found that Plaintiff's "marketplace recognition primarily hinges on its distinctive, hand painted blue-and-white bottles"—not the mark itself. Considering the evidence deduced at trial and our precedent, *see supra*, this finding is completely plausible. Indeed, it is the majority who appears to be mistaken, as it conflates recognition of the bottle with recognition of the word mark, stating "[t]he district court found that the CLASE AZUL word mark lacked marketplace recognition even though its distinctive blue-and-white bottles had widespread market recognition." The majority then conducts a review of select evidence, wholly failing to mention other evidence like that set forth above. But the Supreme Court is clear that we must look at the "record *in its entirety*." *See Anderson*, 470 U.S. at 574 (emphasis added). And the record here supports the district court's finding that "the CLASE AZUL mark is not driving marketplace recognition."

iii.

Finally, as to third-party use, I disagree that looking at "casa" and "azul" instead of "clase" and "azul" infected the district court's factual finding. The majority acknowledges that third-party use does not require a court to look only at third-party usage of the *entire* mark, *i.e.*, marks containing both "clase" and "azul." So here, the court should look to third-

[2] And there is no allegation, nor any finding of fact, remotely suggesting that the distinctive bottle is similar to Casa Azul's packaging.

party use of the common word "azul" or, more precisely, "c" word plus "azul." *See Future Proof*, 982 F.3d at 293 ("[E]vidence of 'third-party single and multi-word uses' of a mark tends to show weakness." (quoting *Sun Banks*, 651 F.2d at 315)). And the district court did just that, even if inadvertently, when it looked at "various CASA and AZUL brands." Most of the other brands it looked at either contain "azul" or "c" word plus "azul": AZULEJOS, CAMPO AZUL, FLECHA AZUL, ARTE AZUL, LUNAZUL, PIEDRA AZUL, CAZUL 100, and CASAZUL. Only a few of the brands contained little to no similarity to CLASE AZUL: CASAMIGOS, CASA MAESTRI, CASA DRAGONES, and CASA DEL SOL.

In fact, the plethora of similar marks has produced what the majority recognizes as a "crowded field," where "consumers are trained to home in on the non-shared features of the word mark to distinguish between products." As the majority admits, "[b]ecause these marks likewise begin with 'c,' the evidence is stronger that consumers tune in even closer to the differences: 'ampo,' 'asa,' 'asino,' and, as in plaintiff's mark, 'lase.'" Therefore, regardless of the purported "error," the record supports the district court's finding.

The majority also instructs that "correcting the legal error requires additional factual findings concerning the extent and significance of third-party use of the relevant terms." But the majority concedes that the record contains evidence that "brands containing 'azul' were well-promoted and recognized by consumers." Indeed, Defendant introduced ample evidence that every single brand supporting third-party usage was "actually used by third parties." The third-party marks were introduced in their bottle forms, and Clase Azul's CEO admitted that each "is sold in the United States." This evidence, especially under this court's precedent—which has found that just "six examples of third-party usage . . . constituted 'widespread third-party use'"—is enough to end the inquiry. *Future Proof Brands*, 982

F.3d at 294 (citing *Springboards to Educ.*, 912 F.3d at 815). The record therefore establishes adequate evidence of the "nature and extent" of these third-party uses.

The majority's instruction to the district court to "consider the absence of sales data, consumer surveys, and other evidence that would bolster a finding that the third-party uses are widespread and recognized by consumers" is not supported by our precedent. The case it cites in support, *Streamline Production Systems*, 851 F.3d at 454, involved only *one* other third-party use. So there, more—like sales data and consumer surveys—would be needed to establish adequate third-party use. But here, where there are at least eight other third-party uses, our precedent does not require that degree of evidence. Indeed, we have found that third parties simply branding their products with the shared mark constitutes "significant evidence of third-party use." *See Future Proof Brands*, 982 F.3d at 294.

For those reasons, the district court did not clearly err in concluding that any strength the CLASE AZUL mark may have is diminished by pervasive third-party usage.

* * *

When assessing the strength of the mark, we look at the district court's *ultimate* finding and whether the record in its entirety supports that finding. *See Future Proof Brands*, 982 F.3d at 292. As explained, the district court's finding "that the CLASE AZUL mark is not strong, weighing against finding a likelihood of confusion" is plausible in light of the record as a whole. Even if the district court committed one or two "errors," its ultimate conclusion that CLASE AZUL is weak is "not necessarily erroneous" considering the evidence presented at trial and our precedent. *Id.*

B.

Moving to the similarity-of-products digit, the majority finds that the district court erred in two ways: (1) it erred in finding that the parties' bottled tequilas are dissimilar, and (2) it erred in finding that Casa Azul's "canned tequila sodas are plainly dissimilar products" to Clase Azul's tequila.

As to the first "error," the majority takes a 50,000-foot view: The fact that Plaintiff and Defendant both produce bottled, distilled tequila with an alcohol content of 40% "alone is more than sufficient to conclude that the products are sufficiently similar for purposes of this digit." The majority cites four cases in support. But these cases do not share the 50,000-foot view the majority posits.

In two of the cases cited, the court found product similarity after considering more than just the product itself. *See In re Majestic Distilling Co.*, 315 F.3d at 1316 (finding that malt liquor and tequila are similar "by virtue of the fact that both are alcoholic beverages *that are marketed in many of the same channels of trade to many of the same consumers*" (emphasis added)); *Xtreme Lashes*, 576 F.3d at 234 (concluding that products sold by plaintiff and defendant are "nearly identical," *considering product packaging, type of consumers, and advertisement channels*). And in the other two cases, the court did find that product similarity weighed in favor of a likelihood of confusion by focusing on the products themselves, but in those cases, the marks themselves were very similar. *See Beef/Eater Restaurants*, 398 F.2d at 639 (finding that "Beef/Eater, Beefeaters, Beefeater and the Beefeater Guard Symbol by defendant" are "so similar to plaintiffs' trade name Beefeater and the Beefeater Guard Symbol"); *Gruma Corp.*, 497 F. App'x at 397–98 (concluding district court erred in finding that the similarity-of-the-marks digit favored defendant where it was "inescapable that both are clearly employing the device of a mission-style tower associated with Mexico and South Texas to draw an association with the name Mission and the Mexican food each party sells").

This inverse relationship between mark similarity and product similarity (*i.e.*, the greater the similarity of the marks, the less similar the products need to be) makes sense. For instance, if names or logos are identical or nearly identical, it would require very little product or industry overlap to assume that the same company is expanding its product line. Conversely, where names or logos are dissimilar, the more overlap between products (and their consumers, prices, and trade channels) needs to occur for confusion to exist. *See* 3 McCarthy on Trademarks and Unfair Competition § 23:20.50 (5th ed.) ("The greater the similarity of the marks, the lesser is the similarity required in the goods or services of the parties to support a finding of likely confusion. . . . If the marks are identical, then the degree of similarity between the parties' goods or services can be quite large . . . .") (collecting cases); *In re Majestic Distilling Co.*, 315 F.3d at 1315 ("The Board found that, if marketing *under the identical mark*, consumers would be likely to believe that malt liquor and tequila emanate from, or are sponsored or endorsed by, the same entity." (emphasis added)).

So products should not be viewed in isolation. Instead, a finding under this digit should take into account mark similarity and, where the marks are not identical, other factors such as consumer price, trade channels, and product packaging. Here, the district court found—and the majority agrees—that the marks are not all that similar. Accordingly, the 50,000-foot view that the majority endorses is not appropriate here. *See Sorensen*, 792 F.3d at 729 ("In other words, we said that two restaurants are not necessarily similar products just because they are both restaurants."). Instead, the court should focus on other factors, like price and product packaging, when assessing product similarity.

To its credit, though, the majority considers the price of the bottled tequila. The majority posits that "the price points of the products here are not so different that a consumer would think it implausible that they could be

from the same source." But besides citing one out-of-circuit case that hardly supports its proposition, the majority cites no law to support its analysis. *See Sorensen*, 792 F.3d at 729–30 (stating "[a] Michelin-starred French restaurant is wholly different from a Chinese take-out restaurant" in terms of ambiance and themes and colors and design, with no mention of price). Perhaps there is no law to support its price analysis because the district court's price finding was purely factual. The majority cannot claim error just because it would find differently. *See Guzman*, 808 F.3d at 1036 ("This standard plainly does not entitle this court to reverse the findings of the trial judge simply because we are convinced that we would or could decide the case differently."). Instead, price is a factor to be considered in conjunction with other factors when assessing product similarity; it is part of the context against which this digit is assessed.

And that is what the district court did here—it assessed product similarity, considering the differences in price and type of tequila (luxury vs. organic, additive-free), to find that the parties' bottled products are dissimilar. The same can be said for the second "error"—consumer perception regarding the expansion of Clase Azul's product line to include a tequila soda product. The digit does not require, as the majority posits, evidence that "consumers would find it *im*plausible" that Plaintiff's and Defendant's products could come from the same source. In fact, by requiring such evidence, the majority effectively switches the evidentiary burden and places it on the defendant. *Cf. Sun Banks*, 651 F.2d at 315 ("[T]he burden of proof of infringement must be borne by the party claiming injury.").

This court recently reiterated the relevance of dissimilarities between like products or services in *Rex Real Est. I, L.P. v. Rex Real Est. Exch., Inc.*, 80 F.4th 607 (5th Cir. 2023). There, the court expressed skepticism that services were similar for purposes of confusion even when both Plaintiff and Defendant offered "'real estate brokerage services,' both 'firms have

brokered deals for various types of properties,' and 'both regard the same companies as their direct competitors.'" 80 F.4th at 622. The court pointed out that the disparity in volume of sales and types of customers did "not support Plaintiff's argument that both companies provide the same services." *Id.* To the contrary, the evidence suggested that "Plaintiff and Defendant operate in different corners of the real estate market and cater to different sets of prospective customers." *Id.* For this reason, it was "unlikely" that "the consuming public would believe that the natural tendency of brokers involved in commercial and investment real estate is to expand into the brokerage of single-family homes." *Id.* at 623. Similarly, here, the difference in price, type of tequila, product packaging, and types of consumers render the district court's finding plausible. *See Xtreme Lashes*, 576 F.3d at 234.

Because I disagree with the majority's application of the law on this digit, I find no error.

C.

As for the disparity-in-consumers-and-stores digit, while I agree that the record evidence indicates the district court was incorrect in its factual finding that Plaintiff's products are not sold in grocery or big box stores, I would not find clear error on this digit based on this alone. That mistaken "fact" was not the sole basis for the district court's finding. The district court concluded that "even when the products are sold in the same stores," Defendant's product "is sold either in a designated organic or additive-[free] section, or next to other tequilas in a similar price range" whereas "plaintiff's products are often locked behind the cash register or in a locked display because their high price makes them targets for thieves." Due to the large disparity in "price point and store placement," the district court concluded that "the products are likely to be sought or found by different customers."

The error regarding big-box stores does not change this. Even when found in the same retail outlets, the district court was clear that the products vary significantly in pricing and are found in different sections of those stores.[3] Therefore, the district court's finding that "the parties' products do not have a similar consumer or store base sufficient to create a likelihood of confusion" is surely plausible in light of the record as a whole and not clearly erroneous.

D.

Finally, actual confusion. "Sometimes, what appears at first glance to be evidence of confusion is merely evidence of consumer error not related to name confusion." 3 McCarthy on Trademarks and Unfair Competition § 23:13 (5th ed.). While "courts may not ignore evidence of actual confusion," *Xtreme Lashes*, 576 F.3d at 230, "not all confusion counts," *Streamline Prod.*, 851 F.3d at 457. As the majority notes, where—like here—there is no evidence of swayed purchases, "more is required." *Rex Real Est. I*, 80 F.4th at 625. Anecdotal evidence of actual confusion must show "more than a fleeting mix-up of names" and that the "confusion was *caused* by the trademarks employed." *Streamline Prod.*, 851 F.3d at 457 (emphasis added). We reject "anecdotal evidence of actual confusion when the proponent [does] not show that a misleading representation by [the defendant], as opposed to some other source, caused a likelihood of confusion." *Id.* (citation omitted). Moreover, even when anecdotal evidence suggests confusion among potential consumers, the weight is "lessened" by the parties' "high

[3] The majority even questions why "Clase Azul would have pressed the district court to find that its products are sold in the same stores as Casa Azul" because "[t]he fact that the same exact stores do not carry both parties' merchandise enhances the likelihood of confusion." *La. World Exposition*, 746 F.2d at 1041. Therefore, a finding that the parties' products are sold in the same stores tends to *decrease* the likelihood of confusion. So, remanding based on this error likely will only further support the district court's finding.

volume of business and extensive advertising." *Rex Real Est. I*, 80 F.4th at 627

The majority admonishes the district court for failing to "give the evidence the weight that our precedent requires," as "there was a significant amount of evidence of actual confusion that the district court did not mention." The instances of confusion the majority points to, however, are anecdotal evidence, and Plaintiff failed to tie this anecdotal evidence to any "misleading representation" by Defendant. In other words, Plaintiff failed to prove that Defendant's name mark *caused* the name mix-ups, especially when there is evidence of multiple name "mix-ups" before Casa Azul even entered the tequila market. Indeed, mistaken references to Casa Azul occurred for at least *ten years* before this lawsuit. Plaintiff's own trial exhibits displayed *multiple* emails—including with Clase Azul-affiliated individuals and distributors—that made "mistaken references to Plaintiff or its Tequila as 'Casa Azul' prior to" the launch of Casa Azul tequila products. Clase Azul's founder confirmed at trial that "there were instances where individuals would carelessly refer to Clase Azul tequila using the incorrect name Casa Azul" even "before [Casa Azul] entered the market." That individuals with deep industry knowledge "ma[d]e these kinds of careless errors" *before* Casa Azul ever entered the tequila market suggests that subsequent mix-ups were not "caused by" Casa Azul. And the district court recognized this, explaining that "[t]he defendant presented evidence that there was confusion about the plaintiff's brand name with other products[] long before the defendant began marketing its tequila products."

But even if Defendant's use of the mark could be construed as misleading or causing confusion, Plaintiff's evidence of confusion is undermined by its fleeting nature and by evidence that the two marks had continued commercial success. This court recently emphasized that the weight due to anecdotal evidence of confusion depends "on whether it is

short-lived confusion by individuals casually acquainted with a business or lasting confusion by actual customers." *Rex Real Est. I*, 80 F.4th at 625. Though Plaintiff points to in-store confusion by customers when the tequila sodas launched, one of the marketing agencies saw "less confusion with Clase Azul" several months thereafter. This suggests that any initial confusion was not "lasting" and diminished as the market acclimated to Casa Azul's brand and products.

As the district court explained, both parties "have done very well," with Plaintiff's total sales exceeding $200 million for each of the past three years, and there is "no evidence that Clase Azul's sales declined as a result of Casa Azul entering the tequila market." So, the weight of anecdotal evidence is "lessened" by the parties' "high volume of business and extensive advertising." *Id.* at 627; *see also Sun Banks*, 651 F.2d at 319 (explaining that even when "the record contains several isolated instances" of confusion, that evidence "is negligible . . . in light of the number of transactions conducted and the extent of the parties' advertising"); *First S. Fed. Sav. & Loan Ass'n of Mobile, Ala. v. First S. Sav. & Loan Ass'n of Jackson Cnty., Miss.*, 614 F.2d 71, 74 (5th Cir. 1980) (affirming no likelihood of confusion despite the fact that "[a]ctual confusion of the names of the two institutions has occurred on several occasions").

Also, the district court may have declined to mention many of the instances the majority cites for good reason. Many of these instances came through witness testimony—deposition and trial—and it is within the purview of the district court to reject testimony as not credible, relevant, or probative. *See Sno-Wizard Mfg., Inc. v. Eisemann Prods. Co.*, 791 F.2d 423, 429 (5th Cir. 1986) (refusing to reverse district court's finding "that there was no evidence of actual confusion" when it "explicitly reject[ed] the deposition testimony of one witness as an interested party, and implicitly reject[ed] the trial testimony of three other witnesses"); *see also* FED. R. CIV. P. 52(a)(6).

The district court's finding as to actual confusion accords with its evaluation of the evidence and the record. Though another court might weigh the credibility and facts differently, that alone cannot establish clear error. *Appliance Liquidation Outlet*, 105 F.4th at 373.

II.

Outside of the individual digits, I take issue with the majority's rigid application of the digits of confusion. "These digits are flexible: 'They do not apply mechanically to every case and can serve only as guides, not as an exact calculus.'" *Springboards*, 912 F.3d at 812 (quoting *Scott Fetzer Co.*, 381 F.3d at 485). Again, context is critical, and the majority wholly fails to mention relevant context that bears on the district court's ultimate conclusion. *See Viacom*, 891 F.3d at 192 ("Context is critical to a likelihood-of-confusion analysis, and we 'must consider the application of each digit in light of the specific circumstances of the case; otherwise, we risk inadvertently lowering the standard of confusion.'" (quoting *Scott Fetzer Co.*, 381 F.3d at 485)).

Here, Plaintiff "has not been vigilant in protecting its right in [its] mark." *Amstar Corp.*, 615 F.2d at 265 ("Since it first began using the mark, it has failed to object to 72 third-party registrations of [the mark]."). Despite its awareness of repeated mistaken references to Casa Azul and other brands for years long before Casa Azul entered the tequila market, Plaintiff failed to object to marks that bear similarity to its name until the district court denied a preliminary injunction in this case. And it has yet to object to the dozens of marks incorporating "azul" or, even, "c" word plus "azul" in the brand name. Plaintiff finally brought this suit after nearly 10 years of simultaneous use of the marks CASA AZUL and CLASE AZUL in the alcohol market. *Id.* "A trademark owner that strongly believed its customers were being"—or would be—"deceived would have hardly remained idle for such an extended

period of time."[4] *Id.* The majority's mechanical and rigid application of the digits wholly fails to consider this context, but this context is crucial when assessing the district court's findings—it is part of the entire record that we must assess the district court's factual findings against.

Considering this context alongside the digits of confusion, the district court's ultimate finding that there was no likelihood of confusion between Plaintiff's and Defendant's marks is supported by the record as a whole. *See Future Proof*, 982 F.3d at 298 ("Because a finding of a likelihood of confusion 'need not be supported by a majority' of the digits and each digit 'may weigh differently from cases to case,' we review the court's ultimate conclusion about likelihood of success for clear error." (quoting *Streamline Prod.*, 851 F.3d at 453)).

III.

For those reasons, the district court did not clearly err in its finding that there was no likelihood of confusion between Plaintiff's and Defendant's marks. Accordingly, I respectfully dissent.

---

[4] Also notable is the timeline of the registration and use of the marks. Before Plaintiff filed its trademark application for Clase Azul, Defendant filed an application to register Casa Azul in connection with wine. Receiving no opposition, the USPTO registered the Casa Azul trademark, rendering the mark "incontestable." Defendant sold wine under the Casa Azul mark for 10 years. Then, in 2018, Defendant applied to register the Casa Azul trademark to include alcoholic beverages other than beer. Plaintiff did not oppose the application, and the USPTO registered the mark in 2019. It was not until 2022—more than 15 years after Defendant introduced its mark—that Plaintiff filed this lawsuit.